Robert J. Kahn, Esq. (SBN 95037)
Edward R. Huguenin, Esq. (SBN 173653)
HUGUENIN KAHN LLP
3001 Lava Ridge Road, Suite 300
Roseville, CA 95661
Telephone:  (916) 367-7098
Facsimile: (916) 367-7491
Email:  *rkahn@hugueninkahn.com*
Email:  *ehuguenin@hugueninkahn.com*

Jake C. Weaver (SBN 300962)
Avalon J. Fitzgerald (SBN 288167)
REYNOLDS TILBURY WOODWARD LLP
11601 Blocker Drive, Suite 105
Auburn, CA  95603
Telephone: (530) 885-8500
Facsimile: (530) 885-8113
Email:  jweaver@rtwlawllp.com
Email:  afitzgerald@rtwlawllp.com

Attorneys for Plaintiff VITAL DISTRIBUTIONS, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| VITAL DISTRIBUTIONS, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>   v.<br><br>PEPPERIDGE FARM, INCORPORATED, a Connecticut corporation,<br><br>        Defendants. | Case No.:  2:22-cv-00319-MCE-KJN<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) Breach of Contract**<br>**(2) Breach of Implied Covenant of Good Faith and Fair Dealing**<br>**(3) Accounting**<br>**(4) Declaratory Relief**<br><br>**JURY TRIAL DEMANDED** |

      As a First Amended Complaint, Plaintiff Vital Distributions, LLC ("Vital Distributions" or "Plaintiff") hereby alleges the following against Defendant Pepperidge Farm, Incorporated ("Pepperidge Farm" or "Defendant"):

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) in that this is a civil action, there is complete diversity of citizenship between Plaintiff, a California limited liability company, and Defendant, a Connecticut corporation, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events, acts and omissions giving rise to the claims alleged herein occurred within the Eastern District.

3.      This Court has jurisdiction over Pepperidge Farm in that it maintains business operations, employs persons, owns and/or leases real property, and actively facilitates the sale of exclusive distributorships in California.  In addition, Pepperidge Farm transports and distributes Pepperidge Farm products to and within California, including to its depot in Natomas, CA where Vital Distributions takes delivery of those products, as well as directly to several retail stores that are the subject of this action.  Moreover, the controversy between Plaintiff and Defendant, as alleged herein, relates to and directly arises out of Pepperidge Farm's contacts with California.

## THE PARTIES

4.      Plaintiff Vital Distributions is, and at all times herein mentioned was, a California limited liability company with its principal place of business in Roseville, California.  Vital Distributions has one member, Carl Holmes III, who is a citizen of California.

5.      Defendant Pepperidge Farm is, and at all times herein mentioned was, a Connecticut corporation with its principal place of business in Norwalk, Connecticut.  Pepperidge Farm has registered to do business and, at all times herein mentioned has, been doing business in the State of California.

///

///

///

///

2

## GENERAL ALLEGATIONS

**A.** **Vital Distributions Acquires Its Distributorship.**

6.      Since launching the Pepperidge Farm brand in the 1930s, Pepperidge Farm has been producing baked products, including a wide assortment of cookie and cracker snacks, and has enjoyed considerable success and growth over time.

7.      Throughout the same period, Pepperidge Farm has employed a distribution system relying almost entirely on independent distributors who acquire discrete and well-defined territories and pay substantial sums of money for the exclusive right to sell and distribute Pepperidge Farm products to retail stores within their territories.

8.      Though "independent," the distributors must still rely heavily upon Pepperidge Farm for many aspects of their business.  These include but are not limited to (a) the timely delivery by Pepperidge Farm of sufficient product, as and when ordered, to enable the distributor to meet, service, and expand its sales and delivery efforts within its territory, (b) the proper identification of and accounting for those sales and the accurate determination of the income due the distributor for deliveries made within its territory, (c) the good faith exercise of Pepperidge Farm's discretion in proportionately allocating product to the distributor when demand exceeds supply, and (d) Pepperidge Farm's integrity in honoring its contractual agreement with the distributor, including the distributor's express right to exclusivity and its ability to realize the full sales potential of its territory for Pepperidge Farm products.

9.      The usual and customary manner in which an exclusive distributorship relationship is formed between an interested party on the one hand and Pepperidge Farm on the other is for the interested party and Pepperidge Farm to execute a writing, prepared by Pepperidge Farm, entitled "Pepperidge Farm Consignment Agreement."

10.      To acquire an existing distributorship, the interested party must negotiate and enter into an agreement to purchase the distributorship from the current distributor.  Then, provided Pepperidge Farm (a) has been given proper notice of the proposed sale, (b) does not exercise its right of first refusal, and (c) determines that the purchaser meets Pepperidge Farm's requirements as to

**FIRST AMENDED COMPLAINT**

character, ability, financial responsibility, business acumen, and other factors, Pepperidge Farm then presents the purchaser with a Consignment Agreement in the name of the purchaser, as well as other writings external to the Consignment Agreement, for the purchaser's review, approval and, if approved, execution.

11.    Here, after engaging in that process and accepting some but not all of Pepperidge Farm's proffered writings and agreements as is more fully alleged below, Vital Distributions entered into the Pepperidge Farm Consignment Agreement dated August 28, 2017.  A true and correct copy of the Pepperidge Farm Consignment Agreement, along with its two attached Schedules A and B (collectively, the "Agreement"), is attached hereto as Exhibit A and incorporated herein by this reference.

12.    Based upon Vital Distributions' execution of the Agreement and certain related documents, and Pepperidge Farm's post-escrow approval of the transaction and of Vital Distributions as a Pepperidge Farm exclusive distributor, Vital Distributions acquired the exclusive right to distribute those Pepperidge Farm products specified in Schedule B (the "Consigned Products") within the territory described in Schedule A (the "Territory").

**B.    Vital Distributions' Exclusive Right to Distribute, Sell, or Otherwise Deliver Consigned Products to Retail Stores.**

13.    The Agreement grants Vital Distributions the exclusive right to distribute Consigned Products to "retail stores" within its Territory.

14.    Notably, the term "retail stores" is not expressly defined in or by the Agreement.

15.    In fact, Vital Distributions is informed and believes that Pepperidge Farm has largely been using the same form Consignment Agreement for over thirty years.  Vital Distributions is informed and believes that during that entire time, and through the time Vital Distributions signed the Agreement, the term "retail stores" has never been defined.

16.    Vital Distributions is further informed and believes that Pepperidge Farm has recognized in the past several years that the term "retail store" is much broader than the term may have connoted thirty years ago, and in fact, the term is ambiguous at best in today's modern

FIRST AMENDED COMPLAINT

consumer environment.

17. More specifically, Vital Distributions is informed and believes that, rather than simply revising the Consignment Agreement to define "retail store" or specifically excluding the physical warehouses or other facilities operated by e-commerce/online retail stores from the distributor's territory, Pepperidge Farm instead attempts to preemptively foreclose the issue by asking distributors to sign a separate agreement that purports to exclude any e-commerce, internet sites, or other electronic commerce points of sale and their associated warehouses or other facilities located within the territory (hereinafter "e-commerce warehouses and facilities") from the meaning of the term "retail stores."

18. As a corollary, Vital Distributions is further informed and believes, and thereon alleges, that unless the parties to a Pepperidge Farm Consignment Agreement otherwise agree in a separate writing signed by both parties thereto, the term "retail stores," as that term is used in the Consignment Agreement, includes any e-commerce warehouses and facilities that perform retail sales to the end-consumer/general public.

19. At the time Vital Distributions explored acquiring the Territory, Vital Distributions made it clear to Pepperidge Farm that Vital Distributions saw potential value in the Territory because it contained the untapped Amazon fulfilment center and related facilities used to fulfill online retail sales to the end-consumer.

20. When Pepperidge Farm presented Vital Distributions with the new Consignment Agreement and signing package, however, Pepperidge Farm included an additional document titled "E-Commerce Acknowledgment."  The E-Commerce Acknowledgement asked Vital Distributions, as Consignee, to agree to the following:

> Consignee agrees and acknowledges that any e-commerce, internet sites or other electronic commerce points of sale and their associated warehouses or other facilities operated by such accounts ("E-Commerce Accounts") are not retail stores as such term is used in the Consignment Agreement.  Consignee agrees and acknowledges that Consignee neither has nor will acquire any rights whatsoever (whether under the terms of the Consignment Agreement or otherwise), with

5

FIRST AMENDED COMPLAINT

respect to the E-Commerce Accounts or the distribution of Consigned
Products thereto.

21.    When Vital Distributions reviewed the E-Commerce Acknowledgment at the time of
signing, Vital Distributions made it clear to Pepperidge Farm's representative, who was present in
person, that Vital Distributions did not agree to the E-Commerce Acknowledgment, and in fact,
believed the exact opposite—namely, that e-commerce, internet sites, or other electronic commerce
points of sale and their associated warehouses or other facilities operated by such accounts are in fact
"retail stores" under the circumstances alleged herein.

22.    In response, Pepperidge Farm's representative explained that Pepperidge Farm may
not approve Vital Distributions' acquisition of the Territory without a signed "E-Commerce
Acknowledgment." Again, Vital Distributions made it clear it was not going to sign the E-
Commerce Acknowledgment as the largely untapped Amazon fulfillment centers and related
"warehouses or other facilities" was a significant factor behind Vital Distributions' decision to
acquire this particular Territory in the first instance. Indeed, Vital Distributions likely would not
have proceeded with the acquisition of the Territory if Pepperidge Farm required Vital Distributions
to sign the E-Commerce Acknowledgment as a condition of approval.

23.    After Vital Distributions executed the Consignment Agreement, specifically
*excluding* the E-Commerce Acknowledgment, Pepperidge Farm nevertheless approved Vital
Distributions' acquisition of the Territory and granted the exclusive rights to Vital Distributions set
forth in the Agreement.

24.    Vital Distributions did not sign, or agree to sign, a separate writing or agreement
excluding e-commerce or e-commerce warehouses and facilities from the term "retail stores" as that
term is used in the Agreement, and Pepperidge Farm did not require Vital Distributions to sign such
a writing.

25.    Accordingly, when Vital Distributions acquired the Territory, it acquired the
exclusive right to receive compensation or commissions from all sales of Consigned Products
through "retail stores," whether brick and mortar, e-commerce, or otherwise, where the order or

FIRST AMENDED COMPLAINT

purchase is fulfilled with Consigned Products located within Vital Distributions' Territory.

26.    The course of conduct between the parties for the first several years confirmed Vital Distributions' understanding.

**C.    Vital Distributions' Right to Commissions on the Sale of Consigned Products**

27.    From the Agreement's inception, Vital Distributions has received and continues to receive commissions and compensation from Pepperidge Farm under a variety of circumstances. They include not only those instances where Vital Distributions physically receives and physically delivers Consigned Products to retail stores within its Territory, but also where Vital Distributions neither takes physical possession of the Consigned Products nor makes physical delivery of the Consigned Products to certain retail stores within the Territory.

28.    Each week, Vital Distributions places an order through Pepperidge Farm for the product that Vital Distributions needs to service the stores in the Territory.  Traditionally, Vital Distributions physically receives that product and is responsible for delivering and allocating product among its stores.  In turn, Vital Distributions receives a commission on those products.

29.    In addition, from time to time, Pepperidge Farm direct ships Consigned Products on pallets to retail stores.  For example, Pepperidge Farm regularly ships Consigned Products on pallets directly to Wal Mart locations within Vital Distributions' Territory.  Vital Distributions still receives commissions on those products, subject to a pallet fee that Pepperidge Farm charges for the direct shipping, even though Vital Distributions does not physically take possession or physically deliver those products.

30.    Vital Distributions also receives commissions on products sold through Club Stores (e.g., Costco) within Vital Distributions' Territory – another form of retail stores.  Vital Distributions neither takes physical possession nor physically delivers Consigned Products to Club Stores. Pepperidge Farm ships the product directly to the Club Store on pallets and the Club Store itself is responsible for receiving and otherwise handling the delivery.  Yet, Vital Distributions still receives the commission on these sales, subject to a deduction by Pepperidge Farm for the pallet fee.

31.    Moreover, since the inception of the Agreement, Vital Distributions has received

commissions on the sale of Consigned Products that are sold online and fulfilled with product located at retail stores within Vital Distributions' Territory.  The online sales are shipped directly to the end-consumer.

32.    Vital Distributions' right to a commission is not based on Vital Distributions physically taking possession of Consigned Products, and is not based on Vital Distributions physically delivering Consigned Products to a retail store.

33.    Instead, Vital Distributions receives commissions on Consigned Products that are delivered to Vital Distributions for distribution to retail stores within the Territory and also receives commissions on Consigned Products shipped directly to retail stores within the Territory for which Vital Distributions itself does not physically take possession or deliver.

34.    Nor is Vital Distributions' right to a commission premised on the end-consumer physically stepping foot into a retail store.  For example, if an end-consumer who lives in Roseville purchases Milano Cookies online through Safeway, and the Milano Cookies to fulfill the order come from a Safeway location within Vital Distributions' Territory, Vital Distributions receives the commission.  The same applies to other retail stores who fulfill online purchases with product located within Vital Distributions' Territory, including but not limited to Raley's and Wal Mart.

35.    The end-consumer's place of residence is irrelevant to determining when Vital Distributions is entitled to a commission.  For example, the online purchase from an end-consumer in Roseville is no different than that same person driving to West Sacramento and purchasing the product in store.  Instead, the relevant factor is whether the sale was settled or otherwise fulfilled with Consigned Products located at a retail store location within Vital Distributions' Territory.

36.    Under Paragraph 1 of the Agreement, Vital Distributions is granted the exclusive right to distribute Consigned Products to retail stores within its Territory, and apart from a few noted exceptions, Pepperidge Farm is barred from either selling or delivering or authorizing anyone else to sell or deliver Consigned Products to retail stores within the Territory.

37.    Specifically, apart from retail distributions it may make itself, Pepperidge Farm may only sell Consigned Products within Vital Distributions' Territory when they are in connection with

1  a temporary sales program or to customers who have requested direct billing by Pepperidge Farm.

2       38.    In those instances where Pepperidge Farm has sold Consigned Products to such direct

3  billed customers within Vital Distributions' Territory, which account for the vast majority of sales of

4  Consigned Products within Vital Distributions' Territory, Vital Distributions is entitled to receive a

5  20% commission on the invoiced amount as to those sales.

6       39.    Moreover, as alleged above, by virtue of a separate and long-standing agreement

7  known as Pepperidge Farm's Pallet Delivery Program, a true and correct copy of which is attached

8  hereto as Exhibit B, Vital Distributions is entitled to receive a 20% commission, less a specified

9  pallet fee, for those deliveries Pepperidge Farm makes in connection with a temporary sales program

10  or when stores referred to as Club Stores request palletized delivery from Pepperidge Farm.

11  **D.**    **Other Obligations Under the Consignment Agreement**

12       40.    Under the Agreement, Vital Distributions is entitled to receive and Pepperidge Farm

13  is obligated to deliver sufficient quantities of Consigned Products so as to enable Vital Distributions

14  to "maintain at all times, an adequate and fresh supply thereof in all retail stores in the Territory…."

15       41.    Specifically, in pertinent part, the Agreement provides that "Bakery [Pepperidge

16  Farm] *will* consign and deliver…and Consignee [Vital Distributions] *will* accept sufficient quantities

17  of Consigned Products…" for Vital Distributions to maintain at all times an adequate and fresh

18  supply in all retail stores in the Territory.

19       42.    In Paragraph 2 of the Agreement, Pepperidge Farm reserves the right to allocate its

20  products to Vital Distributions "as nearly proportionately as practicable" if "overall demand for its

21  products exceeds production."  Because this reservation affords Pepperidge Farm with a discretion to

22  determine what is a proportionate allocation, that discretion is subject to the implied covenant of

23  good faith and fair dealing requiring that any allocation must be fair and reasonable, and objectively

24  determined to have been made by Pepperidge Farm in good faith.

25       43.    Under Paragraph 4 of the Agreement, Vital Distributions is obligated to "use its best

26  efforts to realize the full sales potential of the Territory for Consigned Products."  Thus, from its

27  inception, the Agreement contemplated that Vital Distributions could, was expected to, and had the

28

FIRST AMENDED COMPLAINT

right to, expand its sales and deliveries to as many retail stores located within the Territory as it reasonably could. Because Vital Distributions was expected to and was granted the express right to use its best efforts to realize the full sales potential of its Territory, the implied covenant of good faith and fair dealing requires that Pepperidge Farm not interfere with Vital Distributions' rights and expectations in this regard.

44.    Paragraph 9 of the Agreement confirms that Vital Distributions holds the exclusive right to distribute Consigned Products within its Territory and that it may do so, without the need for prior written authorization, to any Chain so long as the delivery is made directly to at least one of the Chain's retail store locations within the Territory.

45.    One of the few exceptions to Vital Distributions' exclusive rights is when a Chain (defined as "any person, firm, corporation or other legal entity that owns or operates three or more retail stores") refuses to handle Consigned Products except via warehouse delivery. However, before Pepperidge Farm can deliver to such warehouses for Pepperidge Farm's own account, two express conditions precedent must be satisfied, as set forth in Paragraph 9 of the Agreement. First, Pepperidge Farm (and Vital Distributions) must make "good faith efforts" to obtain permission from the Chain to make deliveries directly to its retail stores. Second, despite such good faith efforts, the Chain must nevertheless refuse to handle delivery of Consigned Products except via warehouse delivery.

46.    Vital Distributions is informed and believes, and thereon alleges, that Pepperidge Farm delivers to several retail stores within Vital Distributions' Territory for Pepperidge Farm's own account under the guise of Paragraph 9 of the Agreement, but without the two express conditions first being satisfied in good faith. These retail stores include, but are not limited to, Grocery Outlet, BevMo, and Dollar Tree.

47.    Finally, the Agreement at Paragraph 28 is integrated such that it grants Vital Distributions the right and ability to rely upon the terms and conditions of the Agreement in the form in which it was originally entered into, subject only to those matters that were, are, or may be mutually agreed upon provided those matters are expressly confirmed by a writing signed by both

Pepperidge Farm and Vital Distributions.  At no time did Vital Distributions sign any writing that excluded e-commerce and e-commerce warehouses and other facilities from the definition of "retail stores" as that term is used in the Agreement.

**E.    Vital Distributions' Territory and Success Between 2017 and 2020.**

48.    Schedule A to the Agreement describes the geographical breadth and contours of Vital Distributions' exclusive Territory.  As described, the Territory extends through much of Yolo and Sacramento Counties.

49.    At the time Vital Distributions acquired the exclusive distribution rights for Consigned Products within the Territory, the Territory included numerous retail stores, many of which were not being serviced.  Vital Distributions recognized the growth potential within the Territory, not only based upon those retail stores not currently being served, but also new retail store construction and through the expansion of sales and distribution of Consigned Products through e-commerce and the warehouses and other facilities operated by such entities and sites.  Because the Territory includes the Sacramento Airport and the stretch of I-5 from Natomas to the Sacramento Airport, Vital Distributions anticipated significant future growth of physical warehouses and other facilities within the Territory to fulfill online retail sales.

50.    Specifically, and as alleged above, when Vital Distributions acquired the distributorship from its predecessor, Vital Distributions was aware of the location within the Territory of the major fulfillment center (and smaller fulfillment centers) that online retailer Amazon maintained within the Territory.  Vital Distributions was also well aware that Amazon made and would in the future make retail sales to the public using its fulfillment center and other facilities within the Territory to fulfill those orders and purchases.  As alleged above, and given Pepperidge Farm's approval of Vital Distributions' acquisition of the Territory without requiring or securing from Vital Distributions a signed writing excluding e-commerce or e-commerce warehouses and other facilities from the term "retail stores," as that term is used in the Agreement, Amazon's warehouses and other facilities within Vital Distributions' Territory are included within the term "retail stores" (hereinafter "Amazon Retail Stores").

51.     Between 2017 and 2020, the Amazon Retail Stores were largely a non-issue because Vital Distributions believed that Pepperidge Farm was not distributing products to Amazon for sale to end-consumers.  Instead, Vital Distributions believed it was being compensated for all online sales facilitated through retail stores as alleged herein (e.g. Safeway, Raley's, Wal Mart, etc.) when fulfilled with Consigned Products located within the Territory.

52.     Thus, Vital Distributions focused its efforts on significantly increasing sales of Consigned Products within its Territory, moving substantial product through its distribution channels, and attending to Pepperidge Farm's direct sales under Paragraph 3(b) of the Agreement and the Pallet Delivery Program.

53.     During the same period, Vital Distributions serviced numerous stores within the Territory, including Raley's, Safeway, and Save Mart supermarkets, Nugget Markets, CVS, Target and Wal Mart stores, a Wal Mart Supercenter, and Costco.

54.     During this same period, Pepperidge Farm supplied Vital Distributions with the Consigned Products it promised to provide to Vital Distributions so that it could service its customers and grow its sales.  Vital Distributions thus received Pepperidge Farm's promised support to enable Vital Distributions to expand and achieve its longer-term plans to realize more of the sales potential of its Territory.

**F.**     **Pepperidge Farm's Efforts to Cut-Out Distributors and Capitalize on Changed Consumer Behaviors.**

55.     Unfortunately, Pepperidge Farm began to act contrary to its past course of dealing and, in fact, has acted and is acting in direct violation and breach of its obligations under the Agreement.

56.     Specifically, around the outset of the COVID 19 pandemic in 2020, consumer panic buying, stockpiling, and other changes in consumer shopping behavior sent demand for Consigned Products soaring.  Grocery store shelves were routinely empty.  In turn, for the first time, Pepperidge Farm claimed demand exceeded supply and began allocating products to distributors pursuant to Paragraph 2 of the Agreement.

57.     Around the same time, however, e-commerce demand and sales skyrocketed and Pepperidge Farm took notice of the opportunity.

58.     Several months into the pandemic, as Pepperidge Farm's manufacturing normalized and supply resumed, Vital Distributions continued to receive massive product cuts each week.

59.     For example, for at least 18 months, Vital Distributions has been receiving less than 50 percent of the product it orders each week—an insufficient supply to keep the retail stores in the Territory adequately stocked, and in turn, damaging the relationship between Vital Distributions and certain retail stores in the Territory that Vital Distributions spent years building.

60.     While Pepperidge Farm continued to cite COVID-19 as the cause of the supply shortage, Vital Distribution discovered massive amounts of Consigned Products now available for retail sale via the Amazon Retail Stores.

61.     In fact, Vital Distributions discovered a stand-alone Amazon webpage referred to on Amazon as the "Pepperidge Farm Goldfish Store."

62.     Vital Distributions is informed and believes, and thereon alleges, that Pepperidge Farm's contention that it had and continues to have insufficient supply to fulfill Vital Distributions' weekly orders is and was false, pretextual, and belied by the reports published by Pepperidge Farm's own parent company, the Campbell Soup Company ("Campbell's").

63.     Campbell's has confirmed gains in the sale of certain Pepperidge Farm products, including Goldfish crackers.  Specifically, 2021 sales are reported to have exceeded 2020 sales. Campbell's also reports massive gains through e-commerce sales, with executives of Campbell's specifically acknowledging the increasing popularity of grocery shopping online.

64.     On that basis, Vital Distributions is informed and believes, and thereon alleges, that Pepperidge Farm is capitalizing on changes in consumer shopping behaviors at the expense of Vital Distributions (and other distributors), and is using the pandemic as an excuse to redirect its products away from distributors such as Vital Distributions and toward online retailers (e.g. the Amazon Retail Stores) for which Pepperidge Farm is refusing to pay Vital Distributions commissions.  Vital Distributions therefore believes Pepperidge Farm's e-commerce sales growth evidences not a decline

in overall product inventory, but rather a disproportionate allocation of its products away from Vital Distributions, causing Vital Distributions substantial damages and losses according to proof.

65.    Rather than fill Vital Distributions' product orders so that it could meet the needs of its customers, as required by Paragraph 2 of the Agreement, Pepperidge Farm opted to redirect its inventory to online sales for which Pepperidge Farm denies it has any obligation to pay Vital Distributions commissions.

66.    On numerous occasions over the past 18 months, Vital Distributions placed orders with Pepperidge Farm for specific Consigned Products.  On many of those occasions, Pepperidge Farm unilaterally cut those orders, either in whole or in part.

67.    When pressed by Vital Distributions for an explanation, Pepperidge Farm continued to claim a lack of supply.

68.    The unfilled orders meant that Vital Distributions could not supply those same specific Consigned Products to retail stores in its Territory as it saw fit, as a result of which the stores' customers could not find or buy those specific products from those stores.  In turn, this only continued and continues to compound e-commerce demand and sales.

69.    At the same time that Pepperidge Farm denied having any such product for Vital Distributions, Vital Distributions was able to confirm that the same products were readily available in abundance through the Amazon Retail Stores.  More specifically, Vital Distributions confirmed that it could order those same products on Amazon in bountiful fashion, and the retail sale would be settled and the order would be fulfilled with Consigned Products physically located with the Amazon Retail Store locations within Vital Distributions' Territory.  The product would then be delivered within the same day, and at times, within a few hours, to the end-consumer.

70.    Vital Distributions is informed and believes that the supply of key Consigned Products has normalized to pre-pandemic levels, if not greater.  Vital Distributions is further informed and believes that Pepperidge Farm's supply allocation over the past two years will show massive increases in allocation to e-commerce sales of Consigned Products, and a corresponding decrease in Consigned Products actually delivered to distributors.

FIRST AMENDED COMPLAINT

71.     When Consigned Products are ordered online through the Amazon Retail Store, the sale is made by Amazon (i.e., a retail store online completing an online retail sale to an end-consumer) and the Consigned Products used to fulfill certain of those orders are fulfilled specifically from Amazon's warehouses or other facilities physically located within Vital Distributions' Territory.  Vital Distributions is thus entitled to commissions on such sales fulfilled with product located within its Territory.

72.     Pepperidge Farm has refused and, despite numerous demands, continues to refuse to pay commissions to Vital Distributions on such Consigned Products on the basis that the sale is not being performed through a retail store.  Pepperidge Farm ignores, however, the fact that it requested to exclude this exact scenario from the term "retail stores" through the E-Commerce Acknowledgment, but Vital Distributions declined and refused, and Pepperidge Farm nevertheless proceeded to approve Vital Distributions as the exclusive distributor for the Territory.

**G.     Pepperidge Farm's Further Acts, Omissions, and Other Misconduct**

73.     Contrary to Paragraph 2 of the Agreement, Pepperidge Farm has substantially reduced its deliveries of Consigned Products to Vital Distributions such that they are well below 50% of the amount needed to adequately supply the needs of Vital Distributions' existing customers within its Territory.  As a result, Vital Distributions has been unable to meet its existing customers' needs and has been thwarted in its efforts to realize the full sales potential of its Territory for Consigned Products.  By withholding Consigned Products from Vital Distributions, and/or otherwise redirecting them to online retail stores for which Pepperidge Farm refuses to pay a commission, Pepperidge Farm has breached both the express obligations of Paragraph 2 (to supply sufficient product to Vital Distributions) and the implied covenant of exercising its discretion to allocate product among all sellers and distributors in a fair and reasonable manner and in good faith, if and only if, overall demand exceeds supply.

74.     Vital Distributions is further informed and believes, and thereon alleges, that Pepperidge Farm has taken Consigned Products that should have been consigned and delivered to Vital Distributions, and made them available, as herein alleged, to the Amazon Retail Stores, among

1   potentially others who Pepperidge Farm has not disclosed to Vital Distributions, thereby

2   circumventing Vital Distributions not only to avoid the payment of commissions to which Vital

3   Distributions is entitled under the Agreement, but also to diminish the value of Vital Distributions'

4   distributorship.

5       75.     Vital Distributions is further informed and believes, and thereon alleges, that in

6   purporting to allocate Consigned Products to Vital Distributions "as nearly proportionately as

7   practicable," that Pepperidge Farm has instead exercised its discretion in a manner that improperly

8   and disproportionately denies Vital Distributions the quantities of Consigned Products to which it is

9   entitled under the Agreement and, in fact, in a way that Pepperidge Farm intends to result in a higher

10  margin sale (i.e. a sale which Pepperidge Farm contends a commission is not owed).

11      76.     This conduct not only is a breach of the express provisions of Paragraph 1 of the

12  Agreement, which bars Pepperidge Farm from selling or delivering or authorizing any others to sell

13  or deliver Consigned Products to retail stores, as that term is used in the Agreement, but also of the

14  express duty under Paragraph 2, to consign and deliver sufficient quantities of Consigned Products

15  for Vital Distributions' use and needs.  It is also a breach of the implied covenant of good faith and

16  fair dealing, against which the exercise of discretion (under Paragraph 2) in allocating Consigned

17  Products among all who sell such products is to be tested and evaluated, as well as the implied

18  covenant that is incorporated into Paragraph 4 of the Agreement, whereby Vital Distributions' right

19  to attempt to realize the full sales potential of its Territory cannot be unreasonably or unjustifiably

20  impaired.

21      77.     In addition, and contrary to the terms and conditions of the Agreement, Pepperidge

22  Farm has refused to acknowledge and pay Vital Distributions the commissions due to it based upon

23  Vital Distributions' exclusive distribution rights and/or rights to receive commissions based upon

24  sales to and through the Amazon Retail Stores located within Vital Distributions' exclusive

25  Territory.  This is a breach of Paragraph 3(b) of the Agreement as well as of the pallet delivery

26  program.

27      78.     Vital Distributions is further informed and believes, and thereon alleges, that

28

Pepperidge Farm has authorized, and sought to solicit others having the means to distribute products to retail stores within Vital Distributions' Territory, including a wholesale distributor with several business locations within Northern California, including one within Vital Distributions' Territory, to sell or deliver Consigned Products to retail stores within Vital Distributions' Territory, all contrary to Vital Distributions' rights under the Agreement.  This conduct constitutes a breach of the express rights Vital Distributions has under Paragraph 1 of the Agreement, to enjoy the exclusive distribution rights to retail stores for Consigned Products within the Territory.

79.    Vital Distributions is further informed and believes, and thereon alleges, that Pepperidge Farm has engaged in other acts of misconduct and contractual breach, the full nature and extent of which is not presently known, including but not limited to the conduct proscribed or required by Paragraphs 1, 2, 3, and 9 of the Agreement, and that such actions have caused and are continuing to cause a reduction in Vital Distributions' sales and gross revenues, as well as restricting and otherwise hindering Vital Distributions from achieving its historical success and growth, and the realization of the full sales potential of its Territory.  Vital Distributions has not made any changes to or alternations of its business practices, work ethic, or methodology.  The only thing that has changed is the conduct of Pepperidge Farm, as herein alleged.  Accordingly, Vital Distributions reserves the right to seek leave to amend this complaint to allege the additional acts of misconduct and breach at such time as the same are better identified and verified either through formal discovery or otherwise in the course of this action.

## FIRST CAUSE OF ACTION

### Breach of Contract

80.    Vital Distributions realleges and incorporates by reference herein the allegations of Paragraphs 1 through and including 79 above as though fully set forth.

81.    The Agreement, as alleged herein, in conjunction with the terms and conditions of the Pallet Delivery Program, set forth the duties, rights, obligations and responsibilities of both Vital Distributions and Pepperidge Farm as to the distributorship and exclusive right to sell and distribute Consigned Products within the Territory that Vital Distributions acquired in or about August 2017.

82.     Vital Distributions has performed all conditions, covenants, and promises that the Agreement requires Vital Distributions to perform, except for those excused by Pepperidge Farm's failure to perform.

83.     On the basis of the acts, omissions and misconduct alleged herein and as incorporated herein by reference, Pepperidge Farm has breached the express terms of the Agreement.

84.     Specifically, Pepperidge Farm has breached its obligations under Paragraph 2 of the Agreement by failing to deliver to Vital Distributions the quantities of Consigned Products, as required under ¶ 2, sufficient to enable Vital Distributions to properly supply the retail stores in its Territory.  Vital Distributions has placed orders for Consigned Products which Pepperidge Farm has failed and refused to fill and which Pepperidge Farm had the inventory and production capacity to fill.

85.     Pepperidge Farm has further breached Paragraph 2 of the Agreement by failing to allocate product to Vital Distributions in accordance with the express terms of that paragraph as alleged herein.

86.     In addition, Pepperidge Farm breached the terms of ¶ 1 of the Agreement, by selling to, delivering, or authorizing others to deliver or sell Consigned Products to retail stores in Vital Distributions' Territory, including but not limited to, at least one wholesale distributor located within the Territory.

87.     Pepperidge Farm breached the Agreement by refusing to pay Vital Distributions commissions on Consigned Products sold through Amazon Retail Stores when the Consigned Products used to fulfill those sales to the end-consumer were physically located within Vital Distributions' Territory.

88.     Pepperidge Farm also breached the Agreement by delivering Consigned Products to Chains for Pepperidge Farm's own account without the two express conditions first being satisfied pursuant to Paragraph 9 of the Agreement.

89.     As a direct, proximate and legal result of the acts, omissions and misconduct alleged herein, Vital Distributions has suffered harm and sustained damages, and continues to suffer harm

1    and sustain damages, by way of lost revenue and profits, past and future, damage to goodwill and to

2    reputation, past and future, and, among other things, the diminution in and the delimiting of the

3    value of the distributorship itself, all in an amount according to proof at trial but currently

4    anticipated to exceed $1,500,000.00.

5    WHEREFORE, Plaintiff Vital Distributions prays for judgment as against Defendant

6    Pepperidge Farm, all as hereinafter set forth.

7    ## SECOND CAUSE OF ACTION

8    **Breach of the Implied Covenant of Good Faith and Fair Dealing**

9    90.    Vital Distributions realleges and incorporates by reference herein the allegations of

10    Paragraphs 1 through and including 89 above, as though fully set forth.

11    91.    The Agreement, as alleged herein, in conjunction with the terms and conditions of the

12    Pallet Delivery Program, set forth the duties, rights, obligations and responsibilities of both Vital

13    Distributions and Pepperidge Farm as to the distributorship and the exclusive right to sell and

14    distribute Consigned Products within the Territory that Vital Distributions acquired in or about

15    August 2017.

16    92.    In addition to the express terms and conditions of the Agreement, the Agreement also

17    imposed and is subject to the implied covenant of good faith and fair dealing that is implied in every

18    contract to protect the contracting party from conduct that interferes with the right of that party to

19    receive the full and anticipated benefits of and to which it is entitled under the contract.

20    93.    In particular, and among other provisions, the Agreement at Paragraph 2 invests

21    Pepperidge Farm with the discretionary power to affect Vital Distributions' rights under the

22    Agreement insofar as Pepperidge Farm reserved the right to reduce the quantities of Consigned

23    Products allocated to Vital Distributions based upon its own determination of what constitutes an

24    allocation that is "as nearly proportionately as practical" in the event "overall demand for its

25    products exceeds production."

26    94.    Although Pepperidge Farm owed Vital Distributions an implied duty to exercise its

27    discretion in allocating product among all who are involved in the sale and distribution of Consigned

28

Produced, in a fair and proportionate manner, in good faith and in accordance with fair dealing, all as alleged herein, Pepperidge Farm has not done so.

95.    Specifically, as alleged above, Pepperidge Farm has substantially reduced deliveries of Consigned Products to Vital Distributions to well below its needs, and on occasion denying Vital Distributions certain specific Consigned Products thereby creating shortages for Vital Distributions and its customers, all while diverting those products to others, including to the Amazon Retail Stores, within Vital Distributions' Territory, for which Pepperidge Farm refuses to pay Vital Distributions its rightful commissions.

96.    Despite claims by Pepperidge Farm that its production of Consigned Products is down, Pepperidge Farm and its parent corporation have coincident with Pepperidge Farm's claims of a lack of available supply, publicly reported gains in the sale of Pepperidge Farm products, specifically citing the massive growth in e-commerce sales.

97.    Notwithstanding and despite these public reports of production and sales growth successes, Pepperidge Farm has instead refused to allocate, if it even allocated at all, a reasonable and proportionate amount of product to Vital Distributions and has instead acted to either disproportionately allocate product or divert it away from Vital Distributions to and in favor of others, including but not limited to the Amazon Retail Stores.  As such, Pepperidge Farm has breached the implied covenant of good faith in Paragraph 2 by failing to exercise its discretion to allocate product in a fair and reasonable manner, thereby interfering with and frustrating Vital Distributions' expectations under the Agreement.

98.    As a result, Vital Distributions has been harmed through diminished sales and sales capability, all in an amount according to proof at trial, but well in excess of the minimum jurisdictional requirements of this Court.

99.    Pepperidge Farm's wrongful diversion, and unreasonable and unfair allocation of Consigned Products away from Vital Distributions also constitutes an interference with Vital Distributions' rights and expectations under ¶4 of the Agreement.

100.    Under ¶4, Vital Distributions is entitled to "use its best efforts to realize the full sales

potential of the Territory for Consigned Products. By diverting Consigned Products away from Vital Distributions, and disproportionately allocating those same products to others for which Pepperidge Farm does not pay commissions, Pepperidge Farm has further breached, and independently breached, the implied covenant of good faith and fair dealing applicable to Vital Distributions' rights and expectations under Paragraph 4 of the Agreement.

101. Such conduct by Pepperidge Farm, as herein alleged, directly thwarts, undermines, and interferes with Vital Distributions' rights and reasonable expectations to realize the full sales potential of its Territory and therefore constitutes a breach of the Agreement's implied covenant of good faith and fair dealing, all to Vital Distributions' damage and loss of revenue, as herein alleged, in an amount according to proof at trial, but currently anticipated to exceed $1,500,000.00.

102. Vital Distributions has performed all conditions, covenants, and promises that the Agreement requires Vital Distributions to perform, except for those excused by Pepperidge Farm's failure to perform.

103. By failing and refusing to supply Vital Distributions with sufficient quantities of Pepperidge Farm products, and otherwise diverting those products for the use and sale by and through others, including the Amazon Retail Stores, Pepperidge Farm has breached the implied covenant of good faith and fair dealing implied in the Agreement.

104. Pepperidge Farm's claims of a lack of inventory or production capability and capacity are pretextual and belied by its own publicly proclaimed robust production and sales of Consigned Products.

105. Moreover, Pepperidge Farm's explanation for its inability to provide Consigned Products to Vital Distributions, is further belied by the fact, as confirmed by Vital Distributions, as herein alleged, that the very products that have been and are being denied to and withheld from Vital Distributions, can at the same time be found and purchased elsewhere within its Territory, including through the Amazon Retail Stores.

106. By its conduct in redirecting and prioritizing product delivery away from Vital Distributions, and to others, including online retail stores such as the Amazon Retail Stores,

Pepperidge Farm has interfered with and continues to unfairly and improperly interfere with the reasonable expectations of Vital Distributions and deprive Vital Distributions of its rights and benefits under the Agreement.

107.    Further, to the extent Pepperidge Farm has delivered Consigned Products to a central or district warehouse of a Chain without that Chain first refusing direct store deliveries and without Pepperidge Farm first making a good faith effort to obtain permission for direct store deliveries, and to the extent Pepperidge Farm has encouraged and actively solicited Chains to refuse store delivery and accept third-party warehouse delivery, Pepperidge Farm has acted unfairly and in breach of the implied covenant of good faith and fair dealing.  Vital Distributions further alleges that the specific facts of Pepperidge Farm's misconduct in this regard are peculiarly within Pepperidge Farm's knowledge and only available to Vital Distributions through reasonable discovery.

108.    As a result of Pepperidge Farm's breach of the implied covenant of good faith and fair dealing, as herein alleged and according to proof at trial following the completion of discovery, Vital Distributions has suffered harm and sustained damages by way of lost revenue and profits, past and future, damage to goodwill and to reputation, past and future, and, among other things, through the diminution in and delimiting the value of the distributorship itself, all in an amount according to proof at trial but currently anticipated to exceed $1,500,000.00.

WHEREFORE, Plaintiff Vital Distributions prays for judgment as against Defendant Pepperidge Farm, all as hereinafter set forth.

### THIRD CAUSE OF ACTION

#### Accounting

109.    Vital Distributions realleges and incorporates by reference herein the allegations of Paragraphs 1 through 108 above as if fully set forth.

110.    As alleged herein, Pepperidge Farm has delivered and continues to deliver Consigned Products to retail stores, or to other third parties who in turn deliver to retail stores, within Vital Distributions' Territory in violation of the Agreement and without paying commissions to Vital Distributions on those deliveries/sales.

FIRST AMENDED COMPLAINT

111.    Pepperidge Farm owes Vital Distributions commissions based upon sales and deliveries that have been made by Pepperidge Farm to and through the Amazon Retail Stores located within Vital Distributions' exclusive Territory, and potentially others as yet unconfirmed, and thus owes Vital Distributions commissions in an amount that can only be ascertained by a full and complete accounting.

112.    Because the amounts due Vital Distributions can only be identified and quantified through a full and fair accounting, it is therefore necessary for Vital Distributions to have a full accounting of Pepperidge Farm's sales, revenue, profits, and products supplied and delivered to Amazon Retail Stores within Vital Distributions' Territory and any others within Vital Distributions' exclusive Territory as to which Vital Distributions did not receive payment pursuant to the Agreement, including but not limited to, those retail stores for which Pepperidge Farm improperly claims as its own account pursuant to Paragraph 9 of the Agreement.

113.    Pepperidge Farm has not provided Vital Distributions with a complete and detailed accounting, let alone any account, of Pepperidge Farm's sales, revenue, or profits related to Pepperidge Farm's sale and distribution of Consigned Products within Vital Distributions' exclusive Territory for which Vital Distributions is entitled to receive commission payments under the Agreement.

114.    By reason of the foregoing, Vital Distributions prays for an accounting, at the expense of Pepperidge Farm, of Pepperidge Farm's sales, revenue, and profits attributable to all sales and distribution to all retail stores within Vital Distributions' exclusive Territory and as to which Vital Distributions did not receive and has not yet received payment of commissions as required under the Agreement.

WHEREFORE, Plaintiff Vital Distributions prays for judgment as against Defendant Pepperidge Farm, all as hereinafter set forth.

///

///

///

FIRST AMENDED COMPLAINT

**FOURTH CAUSE OF ACTION**

**Declaratory Relief**

115.    Vital Distributions realleges and incorporates by reference herein the allegations of Paragraphs 1 through and including 114 above as though fully set forth.

116.    Vital Distributions contends that under the express terms and conditions of the Agreement, both as set forth in the Agreement and as evidenced by the ancillary writings that were presented to, approved, and executed by Vital Distributions, as well as those that were presented to, disapproved and not executed by Vital Distributions, and Pepperidge Farm's post-escrow approval of Vital Distributions as Pepperidge Farm's exclusive distributor for the Territory, that Vital Distributions is entitled to and has the ongoing and future right to receive commissions on sales of Consigned Products made at any time by and through online retail stores, including but not limited to, the Amazon Retail Stores located within its Territory.

117.    Vital Distributions also contends that Pepperidge Farm is precluded by the terms and conditions of the Agreement from facilitating sales of Consigned Products by others, including the Amazon Retail Stores within Vital Distributions' exclusive Territory.

118.    Pepperidge Farm does not agree with and disputes Vital Distributions' contentions, and instead intends to continue to act in a manner harmful to Vital Distributions and contrary to Vital Distributions' rights under the Agreement.

119.    This dispute is not theoretical in that Pepperidge Farm is presently engaged in the allegedly offending conduct and that Vital Distributions is presently suffering and will suffer future harm as a result.

120.    Vital Distributions therefore seeks a judicial determination of the parties' rights and obligations under the Agreement as alleged herein, and such additional relief, including restitution or disgorgement, as appropriate, but also such injunctive relief as would serve to prevent a recurrence of the alleged misconduct in the future.

WHEREFORE, Plaintiff Vital Distributions prays for judgment as against Defendant Pepperidge Farm as follows:

FIRST AMENDED COMPLAINT

**PRAYER FOR RELIEF**

1.      As to the First and Second causes of action, for compensatory damages against Pepperidge Farm in an amount according to proof at trial, and well in excess of $75,000, exclusive of interest and costs;

2.      As to the Third cause of action, for a full and complete accounting;

3.      As to the Fourth Cause of Acton, for a declaration of the rights and obligations of the parties herein, and for such other relief, including restitutionary and/or injunctive relief as may be appropriate in light of the wrongful conduct alleged herein as to Pepperidge Farm and to prevent such conduct from occurring again in the future;

4.      For reasonable attorneys' fees and costs of suit herein incurred insofar as the same may be allowed by law;

5.      For prejudgment interest at the legal rate on all damages and other sums found to be due to Vital Distributions; and

6.      For such other relief as the Court may deem just and proper.

**JURY DEMAND**

Vital Distributions hereby respectfully demands a trial by jury in this action on all issues so triable.

Dated:  April 20, 2022                    HUGUENIN KAHN LLP


By: _____
                                        Robert J. Kahn
                                        Edward R. Huguenin
                                        Attorneys for Plaintiff Vital Distributions, LLC

# EXHIBIT "A"

2001 – CORPORATION / LLC

# PEPPERIDGE FARM

# CONSIGNMENT AGREEMENT

## * * *

**PEPPERIDGE FARM, INCORPORATED**
**595 WESTPORT AVENUE**
**NORWALK, CONNECTICUT  06851-4482**

**HEREBY GRANTS**

**AN**

**EXCLUSIVE DISTRIBUTORSHIP**

**TO**

**DISTRIBUTOR NAME: Vital Distribution LLC**

**DISTRIBUTOR ADDRESS: 3522 Spring Rose Way**
**Sacramento, CA 95827**

**AS A**
**CONSIGNEE**
**WITHIN THE TERRITORY AND UPON THE**
**TERMS STATED IN THE FOLLOWING PAGES**

**WITH GUARANTY BY**

**GUARANTOR NAME: Carl Holmes III**

**GUARANTOR ADDRESS: 3522 Spring Rose Way**
**Sacramento, CA 95827**

**AS GUARANTOR**

CA01CORP

## DEFINITIONS

(a)  BAKERY ——— refers to PEPPERIDGE FARM, INCORPORATED, the grantor of the Distributorship, a Connecticut corporation having its principal office in Norwalk, Connecticut.

(b)  CONSIGNEE ——— refers to the grantee of this Distributorship identified on the cover page of this Agreement.

(c)  TERRITORY ——— refers to the territory described in Schedule A hereto.

(d)  CONSIGNED PRODUCTS ——— refers to those products listed in Schedule B hereto (subject to modification per Paragraph 10) but only when packaged or wrapped in retail packaging under the brand name "Pepperidge Farm" and sold or intended to be sold to retail stores as fresh (i.e. not preserved or stale), first quality (i.e. not Seconds) merchandise and does not include (1) any of such products sold, or intended to be sold to retail stores, frozen, refrigerated, canned, or otherwise preserved, (2) any of such products sold, or intended to be sold, to retail stores in a raw or uncooked state, (3) any of such products sold, or intended to be sold, to retail stores in bulk for resale by such retail stores at an in-store bakery or at a food-service counter or food-service section located within such retail store, (4) Stale Products, (5) Seconds, (6) merchandise of others containing Consigned Products as components, (7) any of such products packaged or wrapped in food-service or other non-retail packaging or (8) any of such products packaged, wrapped or sold under any brand name other than "Pepperidge Farm."

(e)  STALE PRODUCTS ——— refers to Consigned Products whose shelf life has expired, as determined by Bakery's stale policy existing from time to time.

(f)  SECONDS ——— refers to Consigned Products which do not meet the high standards required by Bakery for distribution in the ordinary manner and thus are deemed by Bakery, in its sole discretion, to be unsuitable for that purpose.

(g)  DISTRIBUTION OR DISTRIBUTE ——— refers to the sale and delivery of Consigned Products to retail stores within the Territory and to such hotels, restaurants, etc., as may be authorized by Bakery per Paragraph 9.

(h)  BULLETIN PRICES ——— refers to the prices for Consigned Products charged by Bakery and published from time to time.

(i)  CHAIN ——— refers to any person, firm, corporation or other legal entity that owns or operates three or more retail stores.

(j)  DISTRIBUTION – refers to the distribution rights described in, and established under, this Agreement.

(k)  GUARANTOR ——— refers to the guarantor of Consignee's duties and obligations under this Agreement identified on the cover page hereof.

## TERMS

1.   EXCLUSIVE OF DISTRIBUTORSHIP.  Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3 (b); provided, however, that Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by Bakery or by any corporation controlled by Bakery.  The terms of this Paragraph are subject, however, to the terms of Paragraphs 6, 7, and 9.

2.   QUANTITIES CONSIGNED.  Bakery will consign and deliver to Consignee at such locations as shall, from time to time, be designated by Bakery, and Consignee will accept sufficient quantities of Consigned Products to maintain at all times, an adequate and fresh supply thereof in all retail stores in the Territory which request such products and whose accounts are not demonstrably unprofitable; provided, however, Bakery reserves the right to allocate its products as nearly proportionately as practicable if the overall demand for its products exceeds its production.  Consignee shall hold and care for all Consigned Products as the sole and exclusive property of Bakery.  Title to all Consigned Products shall be vested in, subject to, and under the control of Bakery until delivered by Consignee to a purchaser.  Consignee shall not encumber or grant any security interest in or lien on, or by action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon, the Consigned Products.

3.   PROCEEDS AND RECORDS OF SALE.

(a)   Except as provided in subparagraph (b), Consigned Products shall be consigned to Consignee at Bulletin Prices, less the percentage specified in Schedule B, for sale and delivery to retail stores at such prices as Consignee may determine.

(b)   Bakery may bill directly any Chains and military commissaries that have requested such direct billing or that request it in the future.  Such directly billed stores in the Territory will be direct customers of Bakery, and Consignee will solicit sales from them and receive product for delivery to them on Bakery's behalf at Bulletin Prices.  Bakery assumes all credit risks with respect to Chains and military commissaries which receive such direct billing.  The funds owed by such chains and military commissaries as a result of the Consigned Products delivered are accounts receivable of, and debts payable to, Bakery and are not the property of Consignee.  Consignee shall have the exclusive right to perform the service of delivery of Consigned Products to such customers of Bakery and Bakery shall not effect such delivery except through Consignee, subject to the provisions of Paragraphs 1, 6, 7, and 9.  For the performance of its services of solicitation and delivery under this subparagraph (b), Consignee, if it shall have made prompt and timely delivery of all charge tickets as required by subparagraph (d) (2), shall be paid a percentage of net proceeds payable to Bakery by the direct billing customers, such percentage to be calculated at the rate specified in Schedule B.

(c)   Bakery may from time to time extend credit to Consignee for Consigned Products to be sold to retail stores on credit extended by Consignee; provided Bakery has approved in advance the stores to receive such credit and the amount and terms thereof.  Notwithstanding the foregoing, any credit extended by Consignee shall be at Consignee's risk.

(d)   (1)  Consignee shall pay promptly each week on the day specified by Bakery for all Consigned Products sold and delivered by Consignee during the preceding week, less any amounts which would be otherwise due on such sales as to which Bakery

CA01CORP

shall have extended credit to Consignee under (c) above, plus any amounts becoming due during such week under the terms of credit extended during any previous week.

(2) Consignee shall promptly deliver to Bakery on such days as Bakery may specify all charge tickets for all deliveries of Consigned Products to direct customers of Bakery for direct billing by Bakery.

(e)    Consignee will keep such records of Consigned Products received and sales and deliveries made as Bakery may from time to time reasonably request; Bakery may inspect such records and Consigned Products at such times as Bakery may select. Without limiting the generality of the foregoing, Consignee agrees that Bakery may take physical inventory of Consigned Products in Consignee's possession whenever and as often as Bakery deems advisable and that Consignee will keep such records of its operation and will furnish Bakery such copies thereof as Bakery may reasonably require.

4.    DISTRIBUTION EFFORTS.  Consignee will use its best efforts to realize the full sales potential of the Territory for Consigned Products.  To this end, Consignee will (a) actively solicit all retail stores in the Territory whose accounts can by profitably handled, (b) maintain at all times an adequate and fresh supply of Consigned Products in all such retail stores, (c) provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate and fresh supply of Consigned Products therein, (d) make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so, (e) cooperate with Bakery in the effective utilization of Bakery's advertising, sales promotion and space merchandising programs and (f) keep fully informed of Bakery's recommended policies and methods for increasing sales and improving distribution service. Consignee may sell or distribute other products, not competitive with Consigned Products, so long as such sale or distribution does not otherwise violate any terms or conditions of this Agreement or interfere with Consignee's performance of its obligations under the terms of this Agreement.  Bakery may, from time to time, establish reasonable sales and/or distribution goals for Consignee and this Distributorship.  Consignee shall either meet or exceed such goals.

5.    DISTRIBUTION SERVICE AND FACILITIES.  Consignee will maintain efficient distribution service throughout the Territory in keeping with the established reputation of Bakery and the high quality of its products. To this end, Consignee will (a) provide adequate equipment and, if not otherwise provided by Bakery, facilities for the receipt, handling and delivery of Consigned Products and the accounting, inventory and billing thereof, including, without limitation, such computer and/or other systems as may be necessary or appropriate therefor and (b) comply with all laws and regulations relating either directly or indirectly to the operation or ownership of the Distributorship, including, without limitation, motor vehicle, food, drug, health and sanitary laws and regulations and (c) maintain such route books and other records as are required by Bakery from time to time. Pursuant to the foregoing, Consignee shall provide, and shall maintain in good and proper working condition and appearance, a delivery truck(s), computer and such other equipment as, from time to time, shall be necessary for the operation of the Distributorship. Consignee shall maintain the general appearance and condition of such truck(s), computer and other equipment, as well as the appearance and deportment of all Consignee's officers, directors, employees, agents, representatives and helpers, in accordance with the established reputation of Bakery and the high quality of its products.

6.    EMERGENCY SERVICE.  If, by reason of illness or vacation or any other cause, Consignee shall be unable at any time to provide or maintain the efficient distribution service contemplated by this Agreement, Consignee will make other suitable arrangements at its own expense for the provision and/or maintenance of such service; but if Consignee is unable or fails to do so, Bakery is authorized in its discretion to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.  Upon the request of Consignee, Bakery will endeavor in any emergency to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.

7.    FAILURE TO SERVICE PARTICULAR STORES.  If Consignee fails for any reason to provide or maintain satisfactory distribution service to any segment of the Territory or to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be.  If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

8.    CHAIN STORE ACCOUNTS.  If any Chain requires that authorization for the distribution of Consigned Products to the Chain's retail stores in the Territory shall be obtained through a central or district office located outside of the Territory, or only in conjunction with the distribution of Consigned Products to its retail stores in other territories, Bakery will cooperate with Consignee in procuring such authorization.  If any Chain refuses to pay or to permit store managers to pay any Consignee directly for Consigned Products and, instead, requires the submission of a consolidated bill to a central or district office of the Chain, Bakery will handle the billing, and the terms of Paragraph 3 (b) shall apply.

9.    PROHIBITED SALES AND DELIVERIES.  Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing.  Also, Consignee will not, without like authorization, make deliveries of Consigned Products to any Chain via a central or district warehouse or in any manner other than directly to its retail stores. If, despite the good faith efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion to sell and deliver the Consigned Products directly to such chain for its own account via warehouse deliveries as long as such refusal remains in effect.  In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period

of time set forth in such written request, distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

10.  MODIFICATION OF LIST PRODUCTS.  The list of Consigned Products set forth in Schedule B hereto may be modified or changed by Bakery from time to time by (a) adding such other products as it may deem advisable among those which it now or hereafter produces, (b) withdrawing within any sales district or other geographic area any Consigned Products (whether originally listed or subsequently added) which it discontinues producing or which it discontinues selling in such sales district or other geographic area or (c) adding or withdrawing at any time with or without notice and for any reason any product designated as "test product," "for market test" or the like.  In addition, Bakery shall have the right from time to time to change the ingredients, the method of production or the labeling or packaging of any Consigned Products.  In addition, if Consignee fails to comply with the terms and conditions of this Agreement with respect to any Consigned Product or Consigned Products, then Bakery may, in addition to any other remedies available to it hereunder, if such failure shall continue for a period of thirty days after written notice thereof from Bakery, without compensation or remuneration to Consignee, delete such Consigned Product or Consigned Products from Schedule B, in which event Consignee's right to distribute such deleted Consigned Products under the terms of this Agreement shall immediately terminate.

11.  SALES DATA.  Consignee will furnish to Bakery such sales data as it may reasonably require for the planning of its production schedules, the expansion of its operations and the planning and conduct of sales promotion programs.

12.  TRADE NAME, ETC.  Consignee may use Bakery's trade name, trademark and distinguishing colors on its truck(s) and other equipment and supplies; provided, however, that (a) Bakery's trade name may not be used as a part of any business name or trade name of Consignee without the written consent of Bakery or in any other way which will tend to confuse the separate identities of Bakery and Consignee, and (b) Bakery shall have the right at any time to revoke the permission granted in this Paragraph if, in its opinion, the general appearance of Consignee's truck(s) or other equipment or the general appearance or deportment of all Consignee's officers, directors, employees, agents, representatives and helpers, shall fall below standards in keeping with the established reputation of Bakery and the high quality of its products.

13.  INSURANCE AND INDEMNIFICATION.  Consignee shall, at Consignee's expense, maintain adequate public liability, property damage and, where appropriate, workers' compensation insurance to protect Bakery and Consignee against any and all claims of personal injury, death or property damage, other than damage to Consigned Products in possession of Consignee.  Such insurance shall be in such amounts and have such limits as shall be acceptable to Bakery or required by the retail stores in the Territory, whichever is greater, shall name Baker as an additional insured thereunder and shall provide that the insurance shall not be terminated without at least fifteen (15) days' prior written notice to Bakery.  Consignee shall, prior to the date of execution of this Agreement, and at least annually thereafter, provide Bakery with insurance certificates evidencing such coverage.  If Consignee fails to obtain or to maintain the insurance coverage required by this Paragraph, Bakery may, at its option, purchase such insurance coverage on behalf of Consignee, and Consignee shall reimburse Bakery in full for the cost thereof. Consignee covenants and agrees to indemnify, defend and save Bakery harmless from and against any and all claims relating to payroll, unemployment compensation, employee benefits, personal injury, death, or property damage (other than damage to Consigned Products in the possession of Consignee) caused or alleged to have been caused directly or indirectly by or as a result of the actions of Consignee or any of its officers, directors, employees, agents, representatives or helpers, or by or as a result of the operation of the Distributorship or any vehicle or equipment owned or used by Consignee or any of its officers, directors, employees, agents, representatives or helpers, and any and all losses, damages, liabilities and expenses (including attorney's fees) incurred by Bakery as a result thereof.  Anything in this Agreement to the contrary notwithstanding, this indemnification provision shall survive any termination of this Agreement.

14.  NON-PERFORMANCE FOR REASONS BEYOND CONTROL.  Neither Bakery nor Consignee shall be liable for any failure to comply with the terms of this Agreement if such failure shall have been caused primarily by fire, labor dispute, strike, war, insurrection, governmental restriction or any other cause beyond the control of the party so failing.

15.  INDEPENDENT CONTRACTOR.  Consignee is a self-employed independent contractor, not an agent or employee of Bakery, and has no authority other than to distribute products consigned hereunder and to solicit orders for and make deliveries of Consigned Products in the case of direct sales of Bakery under Paragraph 3 (b), express or implied, to do or perform any act or thing or to make any warranty or representation or promise or commitment of any character which will be binding upon Bakery or for which it will be responsible, and Consignee will refrain from any conduct inconsistent with the terms of this Paragraph 15.  Consignee may, at its own expense and risk, employ such persons as Consignee shall deem appropriate to assist in the performance of Consignee's obligations under the terms of this Agreement; and Consignee shall be responsible for the hiring, firing, training and supervision of, and all remuneration and benefits for, any person so employed.  The independent contractor relationship between Bakery and Consignee is an essential element of this Agreement.  The discount percentage and commission rate described in Paragraph 3 and the percentages established pursuant to Schedule B or any similar schedule under this Agreement are based in substantial part on such independent contractor relationship and the understanding that the Bakery is not obligated to pay any FICA, income or similar tax or withholding for or on behalf of the Consignee.

16.  LIEN OF BAKERY ON DISTRIBUTORSHIP.  Bakery shall have a first lien on the Distributorship and all proceeds of the Distributorship as security for all indebtedness of Consignee to Bakery at any time outstanding.  Any sale, transfer or assignment of the Distributorship (invalid per Paragraph 18 without the written approval of Bakery) shall be subject to such lien unless such lien shall be expressly released by Bakery in writing.  Consignee shall not, without the prior written consent of Bakery, encumber or grant any security interest in or lien upon, or by its action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon this Distributorship, other than the lien imposed by this Paragraph 16; and it is expressly agreed that Bakery shall have no obligation whatsoever to consent to any such encumbrance, security interest or lien unless and until the proposed lienholder shall have agreed in writing to subordinate its lien, encumbrance or security interest to the lien created by this Paragraph 16.  Bakery's consent to any such

encumbrance, security interest or lien which has been so subordinated to the lien of Bakery established pursuant to this Paragraph 16 shall not be unreasonably withheld.

17.   RIGHT OF FIRST REFUSAL.   Consignee must give Bakery written notice of each proposed sale, conveyance or transfer (hereinafter "proposed sale") of all or any portion of this Distributorship, which notice shall identify the prospective purchaser and the terms and conditions of the proposed sale.  Such notice of proposed sale from Consignee shall be deemed to be an irrevocable offer to sell the Distributorship, or the portion thereof described in such notice of proposed sale, to Bakery on the terms and conditions set forth therein.  Bakery shall have the right, but not the obligation, to accept such offer by giving Consignee written notice of acceptance within thirty days of the later of (i) Bakery's receipt of Consignee's written notice of proposed sale or (ii) Bakery's receipt of the full and complete application of the prospective purchaser, including all requested financial and credit information (which right is hereinafter referred to as the "Right of First Refusal").  Such notice of acceptance from Bakery shall be deemed to be an acceptance of Consignee's offer of sale, and the sale of the Distributorship, or the portion thereof offered for sale, by Consignee to Bakery, on the terms set forth in the notice of proposed sale, shall be consummated at a closing to be held within thirty days of such notice of acceptance.  Bakery's failure or refusal to exercise any Right of First Refusal hereunder does not constitute, and shall not be deemed to be, an approval by Bakery of the proposed sale or the proposed purchaser.  Any change in the identity of the proposed purchaser or in any terms of any proposed sale from those identified in any notice from Consignee to Bakery hereunder shall be deemed to be a new proposed sale with respect to which Consignee must give Bakery a new notice and a new Right of First Refusal in accordance with the terms of this Paragraph 17.

18.   SALE OF DISTRIBUTORSHIP.   The Distributorship may not be sold, conveyed or transferred by Consignee in whole or in part without the prior written approval of Bakery.  Bakery will grant such approval with respect to a proposed sale if (i) Consignee has given Bakery proper and timely notice of such proposed sale as required by Paragraph 17, (ii) Bakery has not exercised, or has in writing refused to exercise, its Right of First Refusal with respect to such proposed sale and (iii) the purchaser meets the requirements of Bakery as to character, ability, financial responsibility, business acumen, adequate facilities and involvement in the business; provided, however, that any such approval shall be conditioned upon Consignee's payment in full, prior to such sale, of all Consignee's indebtedness to Bakery.  In addition, where such proposed sale involves the division of the Territory or the sale of only a portion of the Distributorship, such proposed sale is subject to, and may not be effected without, Bakery's prior written approval of the division of Territory sought to be effected thereby.  Bakery will notify Consignee with reasonable promptness of its approval or disapproval of any proposed sale and, if applicable, of any proposed division of the Territory.  Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of the Distributorship, as a whole or in part, without such written approval shall be void.  Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of this Distributorship, as a whole or in part, on terms that are different from those set forth in, or to a party different from the proposed purchaser identified in, the notice of proposed sale given Bakery pursuant to the terms of Paragraph 17 shall be void.  Any valid sale of this Distributorship as a whole shall operate to release Consignee from all obligations to Bakery hereunder except the obligation to pay in full any adverse balance in its account with Bakery, and Bakery shall have the right in its discretion to require the purchaser to accept a new consignment agreement in substantially the same form, in lieu of continuing this Agreement in effect, in whole or in part, on an assigned basis.

19.   TERMINATION OF CONSIGNMENT AGREEMENT FOR CAUSE.   Bakery, in addition to all other remedies available to it at law or equity and to the extent permitted by law, shall have the right in its discretion to terminate this Agreement at any time, upon written notice to Consignee, for any of the following causes:

(a)   failure of Consignee adequately to realize the sales potential of the Territory and Consignee's failure to make satisfactory improvement within thirty days after notice of inadequacy from Bakery;

(b)   failure of Consignee to the perform or comply with any material term or provision of this Agreement and the continuance of such failure for seven days after written notice thereof from Bakery;

(c)   failure of Consignee to maintain the general appearance and condition of its truck(s) or other equipment or the general appearance or deportment or that of any of its officers, directors, employees, agents, representatives or helpers, in accordance with standards in keeping with the established reputation of Bakery and the high quality of its products and the continuance of such failure for more than five days after written notice thereof from Bakery;

(d)   any repeated failure of the type described in any of subparagraphs (a) through (c) above, even though a previous failure or failures may have been corrected after notice;

(e)   any dishonesty of Guarantor or Consignee or any of its officers, directors, employees, agents, representatives or helpers in his/her or its dealings with Bakery or with others in connection with Consignee's distribution services under this Agreement;

(f)   any actions, activities or practices of Guarantor or Consignee or any of its officers, directors, employees, agents, representatives or helpers which either do, or in the opinion of Bakery are likely to, materially damage the reputation of Bakery and/or Bakery's relations or reputation with consumers, retail stores or any other purchaser of Consigned Products;

(g)   Guarantor's or Consignee's insolvency or admission in writing of his/her or its inability to pay his/her or its debts as they mature;

(h)   the filing of voluntary bankruptcy petition by Guarantor or Consignee or his/her or its failure to vacate an involuntary bankruptcy petition within sixty days after date of filing;

(i)   failure of Guarantor or Consignee to vacate the appointment of a receiver or trustee of Guarantor's or Consignee's business or assets within sixty days after the date of appointment; or

(j)   a general assignment by Guarantor or Consignee for the benefit of his/her or its creditors.

CA01CORP                                     5

(k)    the failure of the Guarantor to be, and at all times remain, the owner, free and clear of all liens, encumbrances and pledges, of a majority of all shares or membership interests of each class of securities or membership interests issued and outstanding by the Consignee, including, without limitation a majority of all voting securities, common stock or otherwise, of the Consignee. Termination of this Agreement and the Distributorship pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except Consignee's right to receive compensation therefor in accordance with the established business practices of Bakery, and each party's right to receive any favorable balances and obligation to pay any adverse balances.

20.    BAKERY'S OPTION TO BUY DISTRIBUTORSHIP.    Bakery shall have the right in its discretion to purchase all or any portion of the Distributorship at any time upon written notice to Consignee. Bakery shall become the owner of the Distributorship, or the portion being purchased, on the date specified in the notice, whether or not a final purchase price has been agreed upon or determined, as provided below. Bakery may begin operating the Distributorship, or the portion being purchased, for its own account on such date. If Bakery elects to purchase all or any portion of the Distributorship pursuant to this Paragraph, it will pay to Consignee a sum equal to (a) the fair market value of the Distributorship, or the portion thereof being purchased, as the case may be, on the date set forth in the written notice plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen. Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery. The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph. Notice of purchase pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the rights and obligations with respect to payment and arbitration stated in this Paragraph.

21.    TERMINATION OF CONSIGNMENT AGREEMENT BY CONSIGNEE.    Consignee shall have the right in its discretion to terminate this Agreement at any time upon thirty days written notice to Bakery. Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except the right to receive any favorable balances and the obligation to pay any adverse balances.

22.    DEATH OF GUARANTOR; DISSOLUTION OF CONSIGNEE.

(a)    In the case of the Guarantor's death, all the terms of this Agreement (see particularly Paragraph 6) shall continue in effect during the next 90 days. If Consignee shall not have sold this distributorship pursuant to Paragraph 18 within such 90 day period, all rights and obligations hereunder of Bakery and Consignee shall terminate at the expiration of such period except (i) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the right of Consignee to receive and the obligation of Bakery to pay to Consignee the entire proceeds (subject, however to Bakery's lien per Paragraph 16) of any sale of this Distributorship (in whole or in part) made or contracted to be made by Bakery within the next 90 days; provided, however, that if Bakery shall have provided distribution services within all or any portion of the territory during all or any portion of the period from the expiration of the first 90 day period to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services. If Bakery provides emergency distribution service under Paragraph 6 during all or any portion of the first 90 day period, any excess of its income over expense in providing such service shall be paid to Consignee (subject to any right of setoff that may exist), but Consignee shall not be liable to Bakery or any excess of its expense over income in providing such services, although any such excess of expense may be deducted from the proceeds of sale.

(b)    In the event that the corporate existence of the Consignee shall be liquidated, dissolved or in any other way terminated or fail to remain in good standing with the state in which it is incorporated, or in the event that the Consignee shall be merged with or acquired by any other person or entity or a controlling interest in the Consignee shall be acquired by any person or entity other than Consignee, then this Agreement, and all rights and obligations of Bakery and Consignee hereunder, shall terminate immediately except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the right of Consignee to receive and the obligation of Bakery to pay to Consignee the entire proceeds (subject, however, to Bakery's lien per Paragraph 16) of any sale of this Distributorship (in whole or in part) made or contracted to be made by Bakery within the next 90 days; provided however, that if Bakery shall have provided distribution service within all or any portion of the territory during all or any portion of the period from such termination to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services.

23.    TERMINATION OF CONSIGNMENT AGREEMENT WITHOUT CAUSE.    Bakery shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the Consignee. Upon termination pursuant to this Paragraph the Bakery will pay to the Consignee a sum equal to (a) the fair market value of the Distributorship on the termination date plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen. Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery. The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph. Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (i) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the rights and obligations with respect to payment and arbitration stated in this Paragraph. This Paragraph, and the rights and remedies set forth in this Paragraph, shall constitute the Consignee's sole remedy in the event of a termination of this Agreement without cause.

24.    WITHHOLDING PRODUCT.    Upon Consignee's failure to fulfill any of its obligations under this Agreement or upon the occurrence of any of the events referred to in Paragraph 19, Bakery shall have the right, without thereby terminating this Agreement,

immediately to discontinue shipment of Consigned Products to Consignee until such time as Consignee shall have completely remedied such failure or occurrence, and no such discontinuance shall be, or be deemed to be, a waiver by Bakery of any of its rights or remedies under this Agreement or at law or in equity, including without limitation, the right to terminate this Agreement for the same failure or occurrence. Bakery's rights and remedies under this Paragraph shall be in addition to, and may be exercised concurrently with, all other remedies available to it under this Agreement or at law or in equity.

25. NOTICES. All notices which are required to or which may be given under the terms hereof shall be in writing and shall be deemed given when deposited in the United States mails, postage prepaid, and addressed to the other party at the address designated for such party on the cover page hereof. Either party may change such address by giving notice of a new address.

26. DURATION OF CONSIGNMENT AGREEMENT. This Agreement shall continue in effect until terminated in the manner provided in Paragraphs 19, 21, 22 or 23, until Bakery has given Consignee written notice of Bakery's election to purchase all or any portion of the Distributorship, as provided in Paragraph 20, or until Bakery has purchased all or any portion of the Distributorship pursuant to the Right of First Refusal, as provided in Paragraph 17. In the event that Bakery has given Consignee written notice of its election to purchase a portion of the Distributorship pursuant to the Right of First Refusal as provided in Paragraph 17, the parties shall promptly enter into a new Consignment Agreement in substantially the form hereof, except for the modification of the Description of Territory in Schedule A to reflect such purchase.

27. GENERAL. The terms of this Agreement shall be construed so as to carry into effect its true intent and meaning, and any ambiguities shall be construed and any inconsistencies shall be reconciled accordingly. Any consent, permission, authorization or waiver given hereunder with respect to any continuing act or condition may be subsequently revoked in the same manner as given. Except as expressly set forth herein, this Agreement may not be assigned by Consignee.

28. ENTIRETY OF CONSIGNMENT AGREEMENT. This Agreement represents the entire agreement between Bakery and Consignee and supersedes any and all prior agreements or understandings between Bakery and Consignee, whether written or oral, regarding distribution of Consigned Products. This Agreement may not be amended orally or by custom or conduct but only by a writing signed by both Bakery and Consignee.


Dated at Norwalk, Connecticut


This Consignment Agreement is
accepted upon the terms stated above.



Dated:  August 28, 2017

APPROVED:                                                    APPROVED:

                                                             PEPPERIDGE FARM, INCORPORATED

By: _____                                 By: _____
Carl Holmes II                                                   Erin Pulito

Its:  President                                              Its:  Director-Distributor & Market Development

## SCHEDULE A

### DESCRIPTION OF TERRITORY

In the State of California, all that territory more fully described as follows.

Note: Retail Stores "fronting" on any thoroughfare or boundary described herein (unless specified otherwise) are deemed to belong to this distributorship territory. The term "fronting" as used in this Description of Territory shall have the same meaning as "facing." Unless specified otherwise, a Retail Store is deemed to be "fronting" the road on which its primary address is located.

Beginning at the intersection of the Yolo/Colusa/Lake County lines;
Thence west and south on the Yolo/Lake County line;
Thence south on the Yolo/Napa county line to the Yolo/Solano county line;
Thence east and south on the Yolo/Solano county line (excluding the city of Winters, California) to the Yolo/Sacramento county line;
Thence northeast on the Yolo/Sacramento county line to the Sacramento River;
Thence continuing north on the Yolo/Sacramento/county line (excluding all route customers on the east) to Interstate Highway 80 (I-80);
Thence northeast on Interstate Highway 80 (I-80) to the Union/Western Pacific Railroad tracks (between East Levee Road and Norwood Avenue;
Thence north on the Union/Western Pacific Railroad tracks to the Sutter/Sacramento county line;
Thence west on the Sacramento/Sutter county line to the Sutter/Yolo county line;
Thence northwest on the Sutter/Yolo county line to the Yolo/Colusa county line;
Thence west on Yolo/Colusa county line to the Yolo/Colusa/Lake county lines, the point of the beginning.

**Dated: August 28, 2017**

**APPROVED:**

By: _____
Carl Holmes III

Its: _President_

**APPROVED:**

**PEPPERIDGE FARM, INCORPORATED**

By: _____
Erin Pulito

Its: _Director-Distributor & Market Development_

CA01CORP

MAP IMAGE

This map is for illustrative purposes only.



# LIST OF CONSIGNED PRODUCTS
## (SUBJECT TO MODIFICATION PER PARAGRAPH 10)

**Milano**
7412 Milano
7435 Orange Milano
7472 Double Chocolate Milano
7481 Raspberry Milano
7567 Milk Chocolate Milano
7947 Mint Milano
8735 Amaretto Milano
8736 Black & White Milano
9038 Chocolate Raspberry Milano
9043 Chocolate Mint Milano

**Entertaining - Boxed Cookies**
7233 Distinctive Selection Large (18 ct)
7521 Golden Orchard Assortment
7704 Ginger Family (18ct)
7912 9 Cup Assortment Holiday Shipper (24 CT)
8310 Chocolate Collection

**Entertaining – Pirouettes**
8781 Mint Chocolate Pirouette
8782 Chocolate Fudge Pirouette
8783 Chocolate Hazelnut Pirouette
8784 French Vanilla Pirouette

**Chocolate Drenched**
9006 Milk Chocolate Drenched Milano
9007 Dark Chocolate Drenched Milano
9008 Chocolate Drenched Mint Milano
9009 Chocolate Drenched Milano Shipper

**Gifting**
9021 Holiday Gift Box

**Other Distinctive Bag**
7410 Bordeaux
7419 Geneva
7420 Brussels Mint
7946 Brussels
7952 Butter Chessmen
8908 Tahiti
9042 Chocolate Chessman

**PF Chocolate Chunk – Crispy**
7522 Tahoe
7708 Chesapeake
7712 Sausalito
7713 Nantucket
7860 Double Chocolate Nantucket
9193 Crispy Chocolate Chunk - White & Milk Chocolate
**PF Chocolate Chunk - Soft Baked**
7821 SB Chocolate Chunk – Nantucket

**Single Serve Goldfish**
7574 Cinnamon GF Grahams,SS (Each Pouch)
7760 Cheddar Cheese GF, SS (Each Pouch)
7867 Cheddar Cheese Goldfish 2 oz.
8127 Goldfish Colors Carton 2 oz.
8799 Cheddar GF 2.5oz Grab Bag
8800 GF Colors 2.25oz Grab Bag
8801 FB Cheddar 2.25oz Grab Bag
9000 Variety Pack (Cheddar GF/ Pretzel GF/ Minin Nantucket 9ct)
9001 Goldfish Colors 9ct. Multipack (1.1oz Pouch)
9002 Flavor Blasted Xtra Cheddar - 9ct
9003 Cheddar Cheese GF, SS 9ct-1.25 oz
9133 12ct Whole Grain Cheddar GF Multi-pack
9137 9ct Whole Grain Cheddar GF Multi-pack

**Baked Naturals**
8932 Wheat Crisps - Zesty Tomato Herb
8934 Wheat Crisps - Toasted Wheat
8942 Pretzel Thins - Simply Pretzel
8943 Snack Sticks - Artisan Cheese
8947 Snack Sticks - Toasted Sesame
8948 Pretzel Thins - Savory Cheddar
9215 Baked Naturals Pre-packed Shipper

**Snack Sticks**
7802 Pumpernickel
7803 Sesame
7805 Three Cheese

**Distinctive Crackers**
7144 Holiday Quartet DC Shipper (24 CT)
7447 Quartet Cracker Asst.
7477 Golden Butter
7487 Hearty Wheat
8985 Classic Water

**Bag Goldfish**
8089 Holiday - Red & Green Goldfish
8539 Goldfish Colors
8546 Parmesan Cheese
8547 Cheddar Cheese
8550 Original
8554 Low Salt Cheddar
8560 Pizza
8561 Baby Cheddar
8562 Pretzel
8563 Bilingual Cheddar
8564 Calcium
8578 Whole Grain Cheddar GF
8930 Starfish Cheddar
**Flavor Blasted Goldfish**
8548 Flavor Blasted Xtra Cheddar GF

CA01CORP

10

7869 SB Choc Macadamia – Sausalito
7884 SB Oatmeal Raisin - Santa Cruz
8203 SB Dark Chocolate Brownie – Captiva
8206 SB Caramel – Carmel
8469 SB Sugar Cookie
8470 SB Snickerdoodle
8899 SB Oatmeal
8900 SB Milk Chocolate
8901 SB Molasses
9192 SB Chocolate Chunk - White & Milk Chocolate

## Fruit Cookies
7462 Verona Apricot Raspberry
7464 Verona Strawberry
9058 Verona Apple Caramel
9059 Verona Blueberry
9109 Montieri Peach Tart
9110 Montieri Apple Cinnamon Tart
9111 Montieri Raspberry Tart
9177 Fruit Cookies Prepacked Shipper

## Old Fashioned/Homestyle
7438 Sugar
7444 Shortbread
7445 Gingermen

## 100 Calorie Pack Cookies
8973 Butter Chessman 100 Calorie Pack
8975 Chocolate Chessman 100 Calorie Pack
8976  Chocolate Chunk 100 Calorie Pack

## Single Serve Cookies
7515 Milano 2 Pk.
7619 Sausalito
7668 Brussels 2Pk.
7696 Nantucket
7796 Milano 3 Pk., (Each Pouch)
7875 Milano 3 Pk., 9ct Tray (comprised of 7796)
7877 CCC Minis,  9ct tray
8797 Mini Chessman Grab Bag
8798 Mini Nantucket Grab Bag
8854 Dark Chocolate Brownie 2-pack
8855 Soft Baked Oatmeal Raisin 2-pack
8884 Milano 3pk. Grab Bag

8551 Flavor Blasted Jalapeno Queso GF
8552 Flavor Blasted Nothin' but Nacho GF
8553 Flavor Blasted Xplosive Pizza GF
8886 Flavor Blasted Blazin Buffalo GF

## Goldfish Box
8172 Extra Cheddar Flavor Blasted Goldfish
8639 Goldfish Colors
8708 Cheddar GF

## Goldfish Box - 18 oz.
7579 18 oz Cheddar Cheese

## Goldfish Variety Packs
7523 Goldfish On The Go Cheddar (Pouch)
7615 Goldfish On The Go Cheddar
7639 Goldfish On The Go Variety Pk
7650 Goldfish On The Go Variety Pk (Pouch)

## 100 Calorie Pack Goldfish
8745 Baby Wholegrain Cinnamon 100 Calorie Pack
8748 Baby FB Wholegrain Cheddar 100 Calorie Pack
8749 Baby Wholegrain Cheddar 100 Calorie Pack
8763 Baby Wholegrain Chocolate 100 Calorie Pack
8869 Pretzel 100 Calorie Pack

## Goldfish Novelty Packs
8392 0.4oz Cheddar GF Pouches
8534 0.4oz pouches FBGF Extra Cheddar

For distribution of the foregoing products to direct billing customers of Bakery under Paragraph 3 (b) of this Agreement, Consignee will, subject to the terms o that Paragraph 3 (b), to be paid a percentage of the net proceeds of such sales payable to Bakery calculated at the rate of 20% of the published prices in effect from time to time for Consigned Products

# EXHIBIT "B"

Pepperidge Farm, Inc.
P.O. Box 5500
Norwalk, CT 06856

I understand that from time to time Pepperidge Farm may be requested to deliver Consigned Products to customers in palletized form through their warehouses and/or cross-docking facilities in connection with temporary sales programs or to Club Stores (the "Pallet Delivery Program"). I hereby request that Pepperidge Farm affect such cross-dock/warehouse delivery to these customers for my account pursuant to the Pallet Delivery Program in effect at Pepperidge Farm from time to time. I agree to participate in that Pallet Delivery Program and to comply with its terms. I understand and agree that, under such Pallet Delivery program Pepperidge Farm (i) may, at its option, deliver Consigned Products to a customer's warehouse and/or cross-docking facility for delivery to retail stores in connection with temporary sales programs or to Club Stores in my territory and (ii) shall pay me an amount equal to the commissions for the Consigned Products so delivered to retail stores in my territory computed at the rate specified in Schedule B of my Consignment Agreement, less an amount to cover a portion of the costs incurred in connection with such Pallet Delivery Program and the delivery of products thereunder. Until further notice, the amount shall be:

| | |
|---|---|
| Full Pallets | $35 |
| Mini Pallets | $20 |
| Single Case Shipments | $1 |

I agree that once such Consigned Products are so delivered to any retail store in my territory, I will, when requested, provide service to those stores for such products as though they had been delivered by me under the terms of the Consignment Agreement.

I acknowledge and agree that Pepperidge Farm may at any time modify, change or terminate the Pallet Delivery Program and/or the amounts paid thereunder, but I request 30 days' notice of any such change. I further acknowledge and agree that the rights set forth in this letter are in addition to, and not in lieu of, any other rights or obligations contained in the Consignment Agreement, including, without limitation, the rights of Pepperidge Farm under the terms of Section 9 of that Agreement. I further acknowledge and agree that the Pallet Delivery Program does not extend to deliveries of Pepperidge Farm product to Drug or Convenience store customers that have refused direct store delivery.

**APPROVED:**                                    **APPROVED:**

**VITAL DISTRIBUTION LLC**              **PEPPERIDGE FARM, INCORPORATED**

By: _____              By: _____
Carl Holmes III                                        Erin Pulito

Its: Its: President                                        Its: Director, Distributor & Market Development

1

## **CERTIFICATE OF SERVICE**

2

3    I hereby certify that on this 20th day of April, 2022, a true and correct copy of
**FIRST AMENDED COMPLAINT** was served via the United States District Court
4    CM/ECF system.  Participants in the case who are registered CM/ECF users will be
served by the CM/ECF system.  Participants in the case who are not registered
5    CM/ECF users will be served by mail or by other means permitted by the court rules.

6

7

8    _____        _____
        Ashley Jackson                            (Signature)
9           of
        Huguenin Kahn LLP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

## SERVICE LIST

| | |
|---|---|
| Igor V. Stadnik, Esq.<br>**Keesal, Young & Logan**<br>1301 Fifth Avenue, Suite 3100<br>Seattle, WA 98101<br>(206) 622-3790<br>igor.stadnik@kyl.com<br>sarah.yong@kyl.com<br><br>Bentley P. Stansbury III<br>**Keesal Young & Logan**<br>400 Oceangate, Suite 1400<br>Long Beach, CA 90802<br>(562) 436-2000<br>bentley.stansbury@kyl.com<br><br>**Attorneys for Defendant PEPPERIDGE FARM, INCORPORATED** | Jake C. Weaver, Esq.<br>Avalon J. Fitzgerald, Esq.<br>**Reynolds Tilbury Woodward LLP**<br>11601 Blocker Drive, Suite 105<br>Auburn, CA 95603<br>(530) 885-8500; Fax: (530) 885-8113<br>jweaver@rtwlawllp.com<br>afitzgerald@rtwlawllp.com<br><br>**Co-Counsel for Plaintiff VITAL DISTRIBUTIONS, LLC** |

- 2 -