1
2
3
4
5
6
7
8                  UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

11   VITAL DISTRIBUTIONS, LLC,              Case No.: 2:22-cv-00319-MCE-CKD

12              Plaintiff,

13        v.                                **ORDER**

14   PEPPERIDGE FARM,
     INCORPORATED,
15
                Defendant.
16

17        By way of this action, Plaintiff Vital Distributions, LLC, ("Plaintiff" or "Vital") seeks

18   to recover from Defendant Pepperidge Farm, Inc., ("Defendant" or "Pepperidge Farm")

19   for various injuries arising out of Defendant's purported breaches of the parties'

20   "Consignment Agreement" (hereafter "Agreement").  Presently before the Court is

21   Plaintiff's Motion for Preliminary Injunction (ECF No. 83).  Having considered the papers

22   filed in conjunction with the Motion, the record in its entirety, and the argument and

23   evidence presented at the hearing before the Court on Thursday, March 28, 2024, that

24   Motion is now GRANTED.  Defendant's oral request to stay this Order is DENIED, and

25   various other administrative matters are addressed in turn as well.

26   ///

27   ///

28   ///

                                            1

**BACKGROUND**

A.    **Background**[1]

1.    **The Agreement**

Defendant is a producer of baked goods, including a wide assortment of cookie and cracker snacks.  Its distribution system relies almost entirely on independent distributors who pay substantial sums of money to acquire discrete rights to distribute Defendant's products within certain well-defined territories.  In August 2017, Plaintiff entered into the Agreement with Defendant, giving Plaintiff the exclusive right to distribute Defendant's products within its defined territory, extending through much of California's Yolo and Sacramento counties.[2]

Under the Agreement, Plaintiff earns commissions on the sale and distribution of consigned products to "retail stores," a term that is not defined in the parties' contract. The Agreement's Schedule A nonetheless does explain that:

> Retail Stores "fronting" on any thoroughfare or boundary described herein (unless otherwise specified) are deemed to belong to this distributorship territory.  The term "fronting" as used in this Description of Territory shall have the same meaning as "facing."  Unless specified otherwise, a Retail Store is deemed to be "fronting" the road on which its primary address is located.

FAC, ECF No. 14, Ex. A.

At the time the parties executed the Agreement, Defendant also purportedly included an additional document for Plaintiff's consideration, an "E-Commerce Acknowledgment" (hereafter "Acknowledgment").  That document asked Plaintiff to acknowledge the following:

---

[1] Unless otherwise indicated, the facts set forth in this section are taken, primarily verbatim, from Plaintiff's First Amended Complaint.  For purposes of the instant Motion, the Court does not automatically take these allegations as true, but a number of them, at least with regard to the instant contract formation, are undisputed.  In addition, the allegations themselves, despite the fact that they have not yet been adjudicated, are relevant to Defendant's Motion.

[2] Plaintiff's sole manager and member is Carl Holmes, a third generation Pepperidge Farm distributor.  Decl. of Carl Holmes, ECF No. 70-3, ¶ 2.  Mr. Holmes' grandfather was an early distributor, and his mother, brother, uncle, and cousin are all current distributors that operate out of the same Sacramento warehouse/depot.  Id.

1
2
3
4
5
6

> Consignee agrees and acknowledges that any e-commerce, internet sites or other electronic commerce points of sale and their associated warehouses or other facilities operated by such accounts ("E-Commerce Accounts") are not retail stores as such term is used in the Consignment Agreement. Consignee agrees and acknowledges that Consignee neither has nor will acquire any rights whatsoever (whether under the terms of the Consignment Agreement or otherwise), with respect to the E-Commerce Accounts or the distribution of Consigned Products thereto.

7
8
9

> From time to time however and at [Defendant's] sole discretion [Defendant] and [Plaintiff] may enter into separate letter agreement to distribute, on temporary non-exclusive basis only, Consigned Products to warehouses or other facilities operated by E-Commerce Accounts located within the territory.   Any such authorization shall be documented pursuant to mutual written agreement.

10

FAC, ECF No. 14, ¶ 20.

11
12        According to Plaintiff, it reviewed the Acknowledgment at the time of signing and

13    made it clear to Defendant's representative, who was present in person, that Plaintiff did

14    not agree to its terms.  In fact, Plaintiff believed the opposite—namely, that e-commerce,

15    internet sites, or other electronic commerce points of sale and their associated

16    warehouses or other facilities operated by such accounts are in fact "retail stores" under

17    the circumstances alleged herein.

18        More specifically, Plaintiff contends, it recognized the growth potential within the

19    territory, not only based upon those retail stores not currently being served, but also new

20    retail store construction and through the expansion of sales and distribution of consigned

21    products through e-commerce and the warehouses and other facilities operated by such

22    entities and sites.  Because the territory includes the Sacramento Airport and the stretch

23    of I-5 from Natomas to the airport, Plaintiff anticipated significant future growth of

24    physical warehouses and other facilities within the territory to fulfill online retail sales.

25    ///

26    ///

27    ///

28    ///

3

1    Indeed, when Plaintiff acquired the distributorship, it was aware of the location

2  within the territory of the major fulfillment center (and smaller fulfillment centers) that

3  online retailer Amazon maintained within the territory.  Plaintiff was also well aware that

4  Amazon made and would in the future make retail sales to the public using its fulfillment

5  center and other facilities within the territory to fulfill those orders and purchases.

6    Defendant's representative indicated that Defendant might not approve Plaintiff's

7  acquisition of the territory absent its agreement to the Acknowledgment, and Plaintiff

8  again made it clear it was not going to sign the Acknowledgment because, in its view,

9  the largely untapped Amazon fulfillment centers and related "warehouses or other

10  facilities" were a significant factor behind Plaintiff's decision to acquire this particular

11  territory in the first instance.  Plaintiff likely would not have proceeded with the

12  Agreement if Defendant had required Plaintiff to sign the Acknowledgment as a condition

13  of approval.  In any event, Defendant eventually approved Plaintiff's acquisition of its

14  territory even absent Plaintiff's agreement to the Acknowledgment.

15    Under the Agreement, Plaintiff received commissions under several

16  circumstances.  First, and most obviously, Plaintiff is paid for physically receiving and

17  delivering consigned products to retail stores themselves physically located within its

18  territory.  Second, Plaintiff is compensated pursuant to Defendant's pallet delivery

19  program.[3] Finally, Plaintiff receives commission for products sold online (e.g., by

20  Safeway, Raley's, or Walmart), fulfilled through territory retail stores, and delivered

21  directly to end consumers.

22  ///

23  ///

24  ///

25  ///

26  --------------------

27    [3] The terms of the pallet delivery program are set forth in a separate agreement.  See FAC, ECF
No. 14, Ex. B. Under that program, in which Plaintiff agreed to participate, Plaintiff receives commissions

28  for products sold in palletized form to customers (e.g., to warehouse stores) in its territory despite never
taking physical delivery of those products.

1    One of the few exceptions to Plaintiff's exclusive rights is when a "chain" (defined

2  as "any person, firm, corporation or other legal entity that owns or operates three or

3  more retail stores") refuses to handle consigned products except via warehouse delivery.

4  FAC, ECF No. 14, Ex. A, ¶ 9.  However, before Defendant can deliver to such

5  warehouses for its own account, two express conditions precedent must be satisfied.

6  First, both Plaintiff and Defendant must make "good faith efforts" to obtain permission

7  from the chain to make deliveries directly to its retail stores.  Id.  Second, despite such

8  good faith efforts, the chain must nevertheless refuse to handle delivery of consigned

9  products except via warehouse delivery.  Id.

10    Plaintiff alleges on information and belief that in contradiction of these terms,

11  Defendant has delivered to several retail stores within its territory for Defendant's own

12  account, without the two express conditions first being satisfied in good faith.  These

13  retail stores purportedly include, but are not limited to, Grocery Outlet, BevMo, and

14  Dollar Tree.

15    Finally, the Agreement also provides parameters for the amount of product to be

16  provided to Plaintiff.  Defendant is obligated to deliver sufficient quantities of consigned

17  products so as to enable Defendant to "maintain at all times, an adequate and fresh

18  supply thereof in all retail stores in the Territory . . . ."  FAC, ECF No. 14, Ex. A, ¶ 2.  "If

19  overall demand for its products exceeds production," however, Defendant "reserves the

20  right to allocate its products as nearly proportionately as practicable."  Id.

21              **2.       The Parties' Course of Conduct**

22    Between 2017 and 2020, the Amazon Retail Stores were largely a non-issue

23  because Plaintiff believed that Defendant was not distributing products to Amazon for

24  sale to end-consumers.  Instead, Plaintiff believed it was being compensated for all

25  online sales facilitated through retail stores as alleged herein (e.g., Safeway, Raley's,

26  Walmart) when fulfilled with consigned products located within the territory.

27  ///

28  ///

1    Around the outset of the COVID-19 pandemic in 2020, however, consumer panic

2    buying, stockpiling, and other changes in consumer shopping behavior sent demand for

3    consigned products soaring.  Grocery store shelves were routinely empty.  In turn, for

4    the first time, Defendant claimed demand exceeded supply and began allocating

5    products to distributors pursuant to Paragraph 2 of the Agreement.

6    At approximately the same time, e-commerce demand and sales skyrocketed,

7    and Defendant purportedly took notice of the opportunity.  Several months into the

8    pandemic, as Defendant's manufacturing normalized and supply resumed, Plaintiff

9    continued to receive massive product cuts.  For example, for at least 18 months, Plaintiff

10    received less than 50 percent of the product it ordered each week—an insufficient

11    supply to keep the retail stores in the territory adequately stocked, and in turn, damaging

12    the relationship between Plaintiff and certain stores that Plaintiff had spent years

13    building.

14    While Defendant continued to cite COVID-19 as the cause of the supply shortage,

15    Plaintiff discovered massive amounts of consigned products were nonetheless available

16    for retail sale via the Amazon Retail Stores.  In fact, Plaintiff discovered a stand-alone

17    Amazon webpage referred to as the "Pepperidge Farm Goldfish Store."

18    According to Plaintiff, Defendant's contention that it had and continues to have

19    insufficient supply to fulfill Plaintiff's weekly orders is and was false, pretextual, and

20    belied by reports published by Defendant's own parent company, the Campbell Soup

21    Company ("Campbell's").  Campbell's has allegedly confirmed gains in the sale of certain

22    products from Defendant, including Goldfish crackers.  Specifically, 2021 sales are

23    reported to have exceeded 2020 sales.  Campbell's also reports massive gains through

24    e-commerce sales, with executives of Campbell's specifically acknowledging the

25    increasing popularity of grocery shopping online.

26    ///

27    ///

28    ///

Plaintiff thus believes that Defendant is capitalizing on changes in consumer shopping behaviors at the expense of Plaintiff and other distributors and is using the pandemic as an excuse to redirect its products away from distributors like Plaintiff and toward online retailers (e.g., Amazon) for which Defendant is refusing to pay Plaintiff commissions. Plaintiff thus alleges that Defendant's e-commerce sales growth evinces not a decline in overall product inventory, but rather a disproportionate allocation of its products away from Plaintiff.

The lack of product available to Plaintiff meant it could not supply product to retail stores in its territory as it saw fit, and stores' customers, in turn, resorted to ordering from e-commerce sites.  To that end, at the same time that Defendant denied having any such product for Plaintiff, Plaintiff was able to confirm that the same products were readily available in abundance through Amazon.  More specifically, Plaintiff confirmed that it could order those same products on Amazon in bountiful fashion, the retail sale would be settled, and the order would be fulfilled with consigned products physically located within the Amazon facilities within Plaintiff's territory.  The product would then be delivered within the same day, and at times, within a few hours, to the end-consumer. Defendant declines to pay Plaintiff commissions for these sales on the basis that sales placed through Amazon do not constitute sales made through "retail stores" in Plaintiff's territory and are thus not covered by the Agreement.

## B.    This Litigation

Plaintiff thereafter initiated this action based on the foregoing facts and setting forth claims for breach of contract, breach of the implied covenant of good faith and fair dealing, an accounting, and declaratory relief.  According to Plaintiff, Defendant was "circumventing Vital Distributions not only to avoid the payment of commissions to which Vital Distributions is entitled under the Agreement, but also to diminish the value of Vital Distributions' distributorship."  FAC, ECF No. 14, ¶ 74.

///

///

7

1    Defendant responded by filing a motion to dismiss, which this Court denied.

2    Plaintiff then moved to compel discovery responses, which motion the magistrate judge

3    granted.  Finally, and most recently, Plaintiff moved for a temporary restraining order

4    ("TRO"), which this Court granted, and a preliminary injunction, which the Court heard on

5    shortened time and grants by way of this Memorandum and Order.

6                    **1.    Defendant's Motion to Dismiss**

7        By way of its Motion to Dismiss, Defendant argued, in relevant part, that:

8    (1) Plaintiff failed to plausibly allege it was entitled to commissions for e-commerce sales

9    because e-commerce is not included within the definition of "retail stores"; (2) Plaintiff's

10   allegations were also insufficient to plead that Defendant impermissibly redirected

11   product away from Plaintiff in violation of the terms of the Agreement; (3) Plaintiff's facts

12   did not support the claim that Defendant delivered to chain stores in contravention of the

13   Agreement or that Defendant authorized third parties to distribute to retail stores in

14   Plaintiff's territory; and (4) Plaintiff's breach of implied covenant claim failed as derivative

15   of its breach of contract claim and because Plaintiff pled insufficient facts to state a bad

16   faith claim in any event.

17       This Court disagreed and held that:

18       Plaintiff has plausibly alleged that the term "retail stores" is
         ambiguous and is susceptible to the meaning Plaintiff gives it.
19       "Under the plain meaning rule, courts give the words of the
         contract or statute their usual and ordinary meaning." Valencia
20       v. Smyth, 185 Cal. App. 4th 153, 162 (2010).  In this case, the
         term "retail stores" is undefined in the Agreement itself, and it
21       is thus difficult for the Court to apply the limitations Defendant
         suggests at the motion to dismiss phase of litigation, where it
22       takes the allegation in the FAC as true and construes them in
         favor of the nonmoving party.  It is reasonable based on
23       Plaintiff's factual allegations to conclude that "retail stores"
         include e-commerce sales made through brick and mortar
24       locations located within the territory.  Indeed, these types of
         sales are arguably no different than online sales made through
25       traditional grocery store websites, which are fulfilled by a brick
         and mortar store and delivered directly to the customer without
26       the customer ever setting foot inside a store.  Such sales are
         indisputably covered by the Agreement.
27

28   ///

8

1   ECF No. 35, at 9-10.  It further observed that:

2          In fact, it seems to the Court that the question is not necessarily
3          whether Amazon and other such retailers qualify as "retail
           stores," but is instead whether those online retailers are
4          located within the territory. That, however, is a question for
           another day.

5   Id. at 10 n.5.  The Court then determined that the remainder of Defendant's arguments

6   as to Plaintiff's breach of contract claims "raise[d] factual disputes as opposed to

7   identifying pleading shortcomings."  Id. at 11.

8          With regard to Plaintiff's breach of implied covenant claim, the Court reasoned:

9          According to Plaintiff, the Agreement vests Defendant with
10         various discretionary powers (e.g., to adjust quantities of
           consigned products allocated to Plaintiff based on Defendant's
11         assessment that "overall demand for its product exceeds
           production" and that the modified allocation would be "as
12         nearly proportional as practical") under various provisions, but
           Defendant purportedly failed to exercise its discretion in good
13         faith. Defendant seeks to dismiss this cause of action on the
           basis that: (1) Plaintiff cannot state a claim under the implied
14         covenant because it failed to state a claim for breach of
           contract; (2) this claim is redundant of the breach of contract
15         cause of action; and (3) Plaintiff has not alleged sufficient facts
           to state a claim in any event.

16         Defendant's arguments are unpersuasive.  Plaintiff's FAC sets
17         forth precisely what one would expect to see in a breach of the
           implied covenant of good faith and fair dealing claim, alleging
18         at base that: (1) Defendant was granted discretion; (2)
           Defendant was expected to exercise that discretion in good
19         faith as that term is implied in the contract; and (3) Defendant
           did not in fact act in good faith.  What is set forth is a classic
20         breach of implied covenant claim, and Defendant's Motion is
           thus DENIED.

21  Id.  Accordingly, the Court denied Defendant's Motion in its entirety after which

22  Defendant filed its Answer on March 24, 2023.  ECF No. 36.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

## 2. Plaintiff's Motion to Compel

2      Over the course of the next few months, the parties engaged in discovery,

3  culminating in Plaintiff filing of a Motion to Compel responses, ECF No. 37, to four

4  Requests for Production of Documents:

5
> **Request No. 40:** All DOCUMENTS that evidence COMMUNICATIONS between YOU and any of YOUR consignees or distributors RELATING TO the sale or delivery of PRODUCTS to AMAZON.

6

7
> **Request No. 41:** All DOCUMENTS that evidence COMMUNICATIONS between YOU and any of YOUR consignees or distributors RELATING TO the sale or delivery of PRODUCTS to e-commerce accounts.

8

9

10
> **Request No. 42:** All DOCUMENTS RELATING TO payments by YOU to any of YOUR consignees or distributors arising out of delivery of PRODUCTS to AMAZON.

11

12
> **Request No. 43:** All DOCUMENTS RELATING TO payments by YOU to any of YOUR consignees or distributors arising out of delivery of PRODUCTS to e-commerce accounts.

13

14  ECF No. 38 at 5, 16, 21.  Now retired Magistrate Judge Kendall J. Newman entertained

15  oral argument and granted Plaintiff's Motion:

16
> The court concurs with plaintiff on the relevance of the documents sought, as any communications and documents exchanged between defendant and other distributors about the scope of the term "retail store" weighs heavily on how this potentially ambiguous term should be interpreted. <u>See</u> Cal. Civ. Code § 1644 ("[T]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."); § 1645 ("Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense.").

17

18

19

20

21

22

23
> As to proportionality, defendant has yet to make a showing that the burden of production outweigh the benefits here, given that the potential scope of production is unclear at this time. <u>See</u> Fed. R. Civ. P. 26(b)(1); <u>see also</u>, <u>e.g.</u>, <u>Gorrell v. Sneath</u>, 292 F.R.D. 629, 632 (E.D. Cal. 2013) (noting that when a party resists discovery, it "has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections."). From the parties' representations at the hearing, it appears they agree that certain categories of documents could be excluded from any such production (i.e. product order and delivery), and so the

24

25

26

27

28

court encourages the parties to continue working together to narrow the scope of the search.   Similarly, defendant has proposed ways of narrowing the questions asked to further hone the issue, and the court encourages cooperation.   If a heavy burden becomes apparent, the parties are encouraged to explore solutions that provide plaintiff with the information it seeks while relieving any overburdensome aspects on defendant (e.g. by examining a subset of documents from a random set of distributors, just from Amazon, etc.).   <u>See</u> Fed. R. Civ. P. 26, advisory committee notes on the 2015 amendments ("The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes.").

Finally, as to defendant's confidentiality concerns, the court notes the parties' stipulated protective order (<u>see</u> ECF No. 19) is in place and can be modified if needed to assuage any such concerns.

For these reasons and as discussed at the hearing, it is HEREBY ORDERED that plaintiff's motion to compel is GRANTED.

ECF No. 44.  It appears Defendant made an initial production of documents in December 2023, Hagey Decl., ECF No. 87-1, ¶ 9, but, as explained below, has since refused to supplement that production.

### 3.   Plaintiff's Motion for TRO

Then, just a few weeks ago, on March 19, 2024, Plaintiff filed a Motion for Temporary Restraining Order ("TRO") seeking relief from this Court from Defendant's sudden and unanticipated exercise of a "Buyback Provision" contained within the Agreement.  Section 20 provides:

BAKERY'S OPTION TO BUY DISTRIBUTORSHIP.   Bakery shall have the right in its discretion to purchase all or any portion of the Distributorship any time upon written notice to Consignee.   Bakery shall become the owner of the Distributorship, or the portion being purchased, on the date specified in the notice, whether or not a final purchase price has been agreed upon or determined, as provided below. Bakery may begin operating Distributorship, or the portion being purchased, for its own account on such date.  If Bakery elects to purchase all or any portion of the Distributorship pursuant to this Paragraph, it will pay to Consignee a sum equal to (a) the fair market value of the Distributorship, or the portion thereof being purchased, as the case may be, on the date set forth in the written notice plus (b) 25% of such fair market value, to be determined either by agreement between

11

> Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen.

Decl. of Carl Holmes, ECF No. 70-3, EX. A.

Pursuant to that section, at 4:30 p.m. on the evening of Friday, March 15, 2024, Defendant had directed an East Coast paralegal to email Vital a notice ("Buyback Letter") that Defendant was exercising its buyback option effective thirty minutes later, at 5:00 p.m. the same night.  See id., Ex. D,E.[4]  According to the Buyback Letter, Defendant advised Plaintiff:

> Pepperidge Farm is providing written notice that it is exercising its right to repurchase the Distributorship for fair market value plus 25%, less any amounts owed to Pepperidge Farm or otherwise deductible in accordance with the Consignment Agreement, effective as of 5:00 P.M. Pacific Time on March 15, 2024 (the "Transaction Date").  Accordingly, you will not receive any commissions from Pepperidge Farm for products distributed after 5:00 P.M. Pacific Time on March 15, 2024.
>
> Pepperidge Farm will calculate the final purchase price as of the Transaction Date based on weekly billed gross amount ("BGA") for the most recent 52 weeks as of the Transaction Date, multiplied by the applicable sales multiple, with the 25% premium added thereto.  As of March 10, 2024, absent any deduction or offset, the fair market value of the Distributorship is $1,010,565.52 (based on average weekly BGA of $27,596 and a multiple of 36.62) and the premium amount is $252,641.38, for a total estimated payment of $1,263,206.90.
>
> . . . .
>
> By March 20, 2024, please either (i) sign below to acknowledge your agreement with the above fair market valuation and methodology or (ii) sign Appendix A to acknowledge your consent to have a panel of three arbitrators decide the fair market value pursuant to Section 20 of the Consignment Agreement.  If we do not receive a signed acknowledgment by March 20, 2024, Pepperidge Farm will assume you are disputing the valuation and accordingly will pursue its right to the fair market value arbitration under Section 20 of the Consignment Agreement, which may proceed in parallel with any other proceedings now pending

---

[4] The parties do not dispute that the manner of notice, email of an unsigned form by a paralegal, was procedurally proper.  The Court is well aware that Plaintiff agreed to accept correspondence through Mr. Holmes' email address.  The Court remains skeptical, however, that an unsigned notice sent from a non-executive level employee constitutes sufficient notice, despite the copying of executive level employees.  Why would the notice contain a signature block for Defendant's authorized representative if no written authorization was needed?

between you and Pepperidge Farm.

Id., Ex. E.  Defendant then "disabled access to Vital's handheld computers used to order product, track, and complete sales and deliveries," effectively locking Plaintiff out of all systems it needed to deliver product.  Id., ¶ 15.

While Defendant couches this maneuver as a straightforward exercise of a contract option, Plaintiff offered evidence in support of its Motion to show that the buyback was timed to stonewall discovery, minimize Plaintiff's value, cut off Plaintiff's income stream and shift the dispositive issues in this case to arbitration.

By way of background, Pepperidge Farm had sought to substitute new counsel in this litigation on January 30, 2024.  The Court granted that request on February 7, 2024. On February 6, February 15, February 24, March 11, and March 14,2004.  Plaintiff's counsel requested available deposition dates for Defendant's witnesses.  Decl. of Jake C. Weaver, ECF No. 70-2, ¶ 8.  New counsel failed to provide a single date for a single witness, but instead demanded that Plaintiff provide deposition dates for its own witnesses.  Defendant likewise refused to review or turn over responsive documents, and then propounded discovery demanding to know how Plaintiff is funding this litigation. Id., ¶ 7, Ex. 3.

In addition, one day prior to issuance of the Buyback Letter, on March 14, a much-anticipated new Costco store opened in Plaintiff's territory.  Holmes Decl., 70-3, ¶ 10.  Plaintiff is informed and believes, based on sales at surrounding Costco locations, that the new Costco store would generate between $5,000 and $10,000 of sales of Pepperidge Farm Products each week.  Id.  Defendant buying back the distributorship would of course prevent Plaintiff from seeing any commissions from that store.

Plaintiff offered evidence it was suffering and would continue to suffer other harms as well.  For example, other than Mr. Holmes, Plaintiff employs four individuals, owns five cargo vans it uses for deliveries, and pays for "payroll, business liability insurance, auto insurance, and worker's compensation insurance."  Id., ¶ 16.

///

1    Plaintiff also continues to pay on a promissory note to the prior distributor who sold the

2    territory to Plaintiff.  None of those assets and liabilities could be maintained after the

3    buyback.

4         Moreover, Plaintiff's specific employees are critical to its success due to their

5    extensive training, institutional knowledge, and established relationships with retail

6    stores within the territory.  If forced to await final adjudication of this issue without

7    maintaining the status quo, Plaintiff will lose its own investment in individuals because

8    Plaintiff cannot afford to pay its employees without a commission base and those

9    employees cannot afford to wait for final judgment before seeking other employment.

10   Id., ¶¶ 17-18.

11        Plaintiff also averred that it had spent the last seven years improving sales within

12   the territory and growing relationships with retailers such that Plaintiff is now purportedly

13   the best distributor in the Bay Area/Sacramento region.  According to Plaintiff, the

14   disruption in service caused by Defendant buying back the distributorship with no notice

15   and potentially utilizing other distributors to cover the territory would damage Plaintiff's

16   relationships with its clients and ultimately impact the level of service provided.

17        The Court granted Plaintiff's Motion and entered a TRO on March 20, 2024,

18   setting a hearing, and accompanying briefing schedule, on the motion for preliminary

19   injunction for March 28, 2024.  Later that day, Defendant filed a Request for Emergency

20   Telephonic Hearing to Modify, Stay, or Dissolve the TRO arguing, in part, that issuance

21   of the TRO would cause Defendant immediate harms:

22              [F]orcing Pepperidge Farm to unwind the planning and
               implementation of our new distribution in the territory would
23             cause needless harm to our goodwill with customers – who
               have just gotten introduced and are doing business with
24             Pepperidge Farm's new representatives.

25             We cannot imagine anything more confusing or strange for a
               retailer to be jerked around in this manner: told of a transition
26             to a new distributor, then forced to re-engage with a former
               distributor who is actively litigating with the brand.
27
               Such events not only would be expensive and cumbersome,
28             but create considerable friction and uncertainty in the field.

1  Decl. of John Lucas, ECF No. 72-1, at ¶¶ 33-35.  The Court nonetheless DENIED

2  Defendant's request.  ECF No. 74.

3       A few days later, Defendant filed a Status Report and Request for In-Person

4  Hearing, explaining that the parties were working diligently to transfer the distributorship

5  back to Plaintiff's control and requesting to appear at the preliminary injunction hearing

6  in person.  ECF No. 81.  The Court GRANTED that request.  ECF No. 82.

7         **4.**      **Plaintiff's Motion for Preliminary Injunction**

8       On March 25, 2024, Plaintiff filed the instant Motion for Preliminary Injunction.

9  ECF No. 83.  Plaintiff offered the following new facts that had come to light since the

10  filing of the Motion for the TRO.

11       On March 19, at least ten (10) of Defendant's representatives brought roughly six

12  (6) Penske moving vans to the depot to seize Plaintiff's inventory.  Holmes Decl., ECF

13  No. 83-3, ¶ 26.  Then, on, March 20, 2024, the day Plaintiff filed its TRO request,

14  Defendant listed Plaintiff's distributorship for sale on its "routes-for-sale" website.  Id., ¶

15  21, Ex. F-J.  The distributorship was broken up into four separate sub-territories and

16  listed for sale at $117,037.52 less than the fair market value Defendant had calculated

17  for the distributorship as a whole in the Buyback Letter.  Id.

18       Once the Court issued its TRO, while it appears that the parties began to work

19  together to re-transition the distributorship back to Plaintiff, as of the date of the filing of

20  the Preliminary Injunction motion, some long-time customers were nonetheless still

21  refusing to accept distributions from Plaintiff, apparently because there was still some

22  confusion about whether Plaintiff had the right to distribute Defendant's products.  Id., ¶

23  31; Decl. of Ghon Vann, ECF No. 83-4, ¶¶ 3-5.  In addition, Plaintiff offered evidence

24  that Defendant had been asking stores whether they had any complaints regarding

25  Plaintiff's service.  Holmes Decl., ECF No. 83-3, ¶ 31; Ghon Decl., ¶ 5.

26  ///

27  ///

28  ///

In its opposition, Defendant did not really deny any of the foregoing facts, but offered its own evidence, by way of a declaration from Defendant's Regional Vice President John Lucas, that, "[b]ecause of the tense relationship between Vital and Pepperidge Farm, we decided, as we have done before, to provide notice on the same day as the effective date of Pepperidge Farm's Buyback to reduce the risk that Vital would engage in misconduct and harm Pepperidge Farm."  Lucas Decl., ECF No. 87-6, ¶ 51.  Part of this tension, according to Mr. Lucas, was because Plaintiff was refusing to transition to new handheld devices Defendant is requiring distributors to utilize in conjunction with new firmwide software upgrades.  Id., § F.  Mr. Lucas also testified that, "[t]he difference between the fair market value in the Buyback [Letter] and in the listed routes' sale price is that the listed price does not include sales to club stores within the territory, which Pepperidge Farm is not selling with the new routes and plans to distribute to directly, as it does today."  Id., ¶ 58.  Finally, Defendant lamented that Plaintiff had raised the issue to the Court of Defendant's personnel purportedly soliciting complaints about Plaintiff's service from stores, rather than raising that issue with Defendant in the first instance.

On March 28, 2024, the Court entertained oral argument and heard testimony from several witnesses.  At the conclusion of the hearing the Court orally granted Plaintiff's motion for a preliminary injunction, denied Defendant's request for a stay, directed that Defendant produce documents within two weeks and that Plaintiff apprise the Court of the progress in that regard, struck Defendant's requests for discovery going to Plaintiff's litigation financing, and set an expedited trial date for September 3, 2024.  This Memorandum and Order formalizes those rulings, and the Court's statements herein supersede any statements it made at the hearing.

///

///

///

///

1

**STANDARD**

2

3        "A preliminary injunction is an extraordinary and drastic remedy."  Munaf v. Geren,

4    553 U.S. 674, 690, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008).  "[T]he purpose of a

5    preliminary injunction is to preserve the status quo between the parties pending a

6    resolution of a case on the merits."  McCormack v. Hiedeman, 694 F.3d 1004, 1019 (9th

7    Cir. 2012).  A plaintiff seeking a preliminary injunction must establish that he is (1) "likely

8    to succeed on the merits;" (2) "likely to suffer irreparable harm in the absence of

9    preliminary relief;" (3) "the balance of equities tips in his favor;" and (4) "an injunction is

10    in the public interest."  Winter v. Natural Res. Defense Council, 555 U.S. 7, 20 (2008);

11    see also Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018).  "If a plaintiff fails to meet its

12    burden on any of the four requirements for injunctive relief, its request must be denied."

13    Sierra Forest Legacy v. Rey, 691 F. Supp. 2d 1204, 1207 (E.D. Cal. 2010) (citing Winter,

14    555 U.S. at 22, 129 S.Ct. 365).  "In each case, courts 'must balance the competing

15    claims of injury and must consider the effect on each party of the granting or withholding

16    of the requested relief.'"  Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Gambell,

17    480 U.S. 531, 542 (1987)).  A district court should enter a preliminary injunction only

18    "upon a clear showing that the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22

19    (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

20        Alternatively, under the so-called sliding scale approach, "[t]he Ninth Circuit

21    weighs [the above] factors on a sliding scale," so that where there are "'serious

22    questions going to the merits'—that is, less than a 'likelihood of success' on the merits—

23    a preliminary injunction may still issue so long as 'the balance of hardships tips sharply

24    in the plaintiff's favor' and the other two factors are satisfied."  Short v. Brown, 893 F.3d

25    671, 675 (9th Cir. 2018).

26    ///

27    ///

28    ///

**ANALYSIS**

### A.    Preliminary Injunction

Plaintiff contends that the award of preliminary relief is warranted because "Pepperidge Farm's purported exercise of Paragraph 20 of the Agreement is an attempt by Pepperidge Farm to take advantage of its contractual material breaches (which are the very subject of this two-year litigation) to the detriment of Vital and is also an independent breach of the covenant of good faith and fair dealing." Pl.'s Not. of Mot., ECF No. 83, at 1. "Specifically, Vital's ["FAC"] alleges numerous material breaches by Pepperidge Farm that have driven down the value of Vital's distributorship." Id. "Pepperidge Farm is now attempting to exercise Paragraph 20 to buy Vital out at a severely discounted price, based on the artificially low value which Pepperidge Farm itself caused by its material breaches at issue." Id. "Of course, by taking over Vital's Territory, Pepperidge Farm also seeks to deprive Vital of a means of funding this litigation, which has become a point of focus for Pepperidge Farm." Id. In addition, Plaintiff takes the position that "Pepperidge Farm's conduct will cause Vital irreparable harm if it is not enjoined pending resolution of this action on the merits in that it will cause Vital to lose its business, loss of employees, loss of goodwill and business relationships, and will severely impact the pending litigation." Id. Finally, Plaintiff contends that "the equities favor issuance of an injunction, and under these circumstances issuance of an injunction is in the public interest." Id.

Defendant, on the other hand, contends that Plaintiff cannot succeed on the merits because it had a clear contractual buyback right at any time and it had good faith reasons to exercise that right. It also takes the position that the claims in the FAC are divorced from its buyback decision and that the FAC is thus irrelevant to Plaintiff's challenges to the buyback. Defendant then argues that Plaintiff has an adequate remedy at law and thus cannot establish irreparable harm, and it takes the position that the remaining factors favor Defendant as well.

1   Finally, Defendant asks the Court to require Plaintiff to post a $200,000 bond given,

2   among other things, that Defendant claims it will incur expenses of $150,000 per month

3   to continue servicing Plaintiff's outdated handheld devices.

4          The Court concludes that Plaintiff has established it is entitled to injunctive relief.

5   Each element is discussed below, but first the Court addresses the threshold question of

6   whether the relief sought here is mandatory or prohibitory.

7                  **1.      Prohibitory Versus Mandatory Relief**

8          The parties dispute whether the injunction sought is prohibitory or mandatory in

9   nature.  Mandatory injunctions are generally disfavored and require a showing that "the

10  facts and law clearly favor the moving party."  Stanley v. University of Southern Cal., 13

11  F.3d 1313, 1319-20 (9th Cir. 1994) (internal quotation marks and citations omitted).  This

12  is because "[a] mandatory injunction orders a responsible party to take action, while [a]

13  prohibitory injunction prohibits a party from taking action and preserves the status quo

14  pending a determination of the action on the merits."  Arizona Dream Act Coalition v.

15  Brewer, 757 F.3d 1053, 1060 (9th Cir. 2014) (internal quotation marks and citations

16  omitted).  "[T]he status quo refers to the legally relevant relationship between the parties

17  before the controversy arose."  Id. at 1061.

18         Until the evening of Friday, March 15, 2024, the status quo for the last seven

19  years was that Plaintiff had operated the distributorship out of the Sacramento depot.

20  On the basis that the relationship between Plaintiff and Defendant was now "troubled,"

21  Defendant attempted to highjack that distributorship after business hours on a Friday

22  night.  That left Plaintiff scrambling and without time, from any practical perspective, to

23  seek relief from this Court.  Certainly it left this Court with no time to act.

24         The Court thus concludes that, under the very unique circumstances of this case,

25  Defendant should not be permitted to unilaterally change the well-established status quo

26  and then capitalize on the new circumstances it created to argue that any return to that

27  norm rises to the level of mandatory relief.  The status quo in this case is the one that

28  existed before Defendant attempted to turn the parties' relationship on its head.

1    Certainly, Plaintiff operating the distributorship is the status quo now that the

2 Court has issued the TRO directing Defendant to convert it back to Plaintiff's control.

3 Given where things are today, the relief Plaintiff seeks by way of the Motion for

4 Preliminary Injunction is absolutely prohibitory.  Plaintiff is simply asking the Court to

5 leave the parties' positions as they currently are, and as they've existed for seven years.

6 Defendant is the one asking to terminate the status quo and to transfer the

7 distributorship to Pepperidge Farm.  At base, Defendant is arguing that the five days it

8 held the distributorship out of the last seven years should be considered the status quo

9 because it managed to successfully blindside Plaintiff.  That flies in the face of common

10 sense.  If not for Defendant's unilateral, eleventh-hour conduct, Plaintiff would have

11 continued to service its territories, at least long enough to have brought this issue before

12 the Court.  Because that is what Plaintiff is doing now, the Court considers Plaintiff's

13 request to ask for prohibitory relief.[5]

14               **2.    Likelihood of Success**

15    Plaintiff contends that by exercising the buyback option in the manner and under

16 the circumstances that it did, Defendant impermissibly attempts to benefit from its prior

17 breaches of the Agreement and that the attempted buyback further constitutes an

18 independent breach of the implied covenant of good faith and fair dealing.  According to

19 Defendant, on the other hand, Plaintiff cannot succeed on a challenge to the buyback

20 because Defendant was contractually entitled to exercise that option at any time for any

21 reason.  Defendant's position is unpersuasive.

22          **a.    Plaintiff has, at the very least, raised serious questions
                 going to the merits of its breach of contract claim, and
23               Defendant's attempt to capitalize on that material breach
                 to Plaintiff's detriment is impermissible.**
24

25    "It is familiar contract law that a party in breach cannot take advantage of his

26 breach to the detriment of the injured party."  <u>Cineblue Internationale</u>

27 _____
        [5] This discussion is somewhat academic because even if Plaintiff sought relief that was mandatory
28 in nature, the Court would conclude that it met the heightened standard necessary to justify such
   extraordinary relief here.

1 Filmproduktionsgesellschaft MbH & Co 1. Beteilgungs KG v. Lakeshore Entm't Grp., No.

2 CV 09-02728 RZ, 2010 WL 11508347, at *4 (C.D. Cal. Feb. 18, 2010).  "It certainly is

3 counterintuitive that a party could fail to fulfill its contractual obligation when due—that is,

4 breach the contract—then wait a period of time, then later eliminate that obligation

5 unilaterally, in a legal version of 'Gotcha.'"  Id., at *3.

6     With regard to Plaintiff's underlying breach of contract claim, the Court previously

7 concluded that Plaintiff had sufficiently stated a claim regarding the FAC.  It now

8 concludes that Plaintiff is likely to succeed on the merits of that cause of action and that

9 Plaintiff cannot take advantage of its prior breaches by invoking a contractual provision

10 that will allow it to buy out Plaintiff at prices it depressed.

11     First, and without any contrary evidence before the Court because Defendant has

12 declined to produce discovery on the issue, the Court concludes that on the instant

13 record Plaintiff has shown that the term "retail stores" likely includes e-commerce sales.[6]

14 In evaluating the parties' arguments under Rule 12(b)(6), the Court relied on the plain

15 language of the Agreement to hold that it was reasonable "to conclude that 'retail stores'

16 include e-commerce sales made through brick and mortar locations located within the

17 territory."  ECF No. 35, at 9-10.

18     At this juncture, the Court further relies on the fact that prior to accepting Plaintiff

19 as a distributor, Defendant specifically tried to push Plaintiff to agree to the

20 Acknowledgment, which would have more clearly defined the scope of retail stores and

21 made clear that e-commerce was not included.  If Defendant had believed that the term

22 "retails stores" was unambiguous and susceptible only to its more narrow definition, that

23 Acknowledgment would have been unnecessary and redundant.  Defendant's decision

24 to abandon the Acknowledgment and approve Plaintiff as a distributor anyway raises

25 serious questions as to whether it acquiesced in Plaintiff's definition.

26

27       [6] The Court infers from Defendant's reluctance to provide discovery on the issues most fundamental to this case that the discovery is not favorable to it.  If Defendant's documents supported its theory regarding the definition of "retail stores," the Court has no doubt that evidence would have been

28 turned over toot sweet.

1      Second, if Plaintiff's definition of retail stores is correct, it follows that Plaintiff has

2  been underpaid, in some undetermined amount, for the last seven years.  That

3  underpayment means that the numbers utilized to establish the fair market value of

4  Plaintiff's distributorship are not only unknown, but cannot be established until a trial in

5  this action can take place.  No good faith arbitration regarding fair market value can

6  occur because there are underlying factual disputes that must be resolved in this

7  litigation that necessarily inform any such discussion.[7]

8      Third, it appears to this Court that Plaintiff may be correct as to Defendant's

9  alleged diversion of product to third parties at Plaintiff's expense.  When Mr. Lucas was

10  questioned before the Court regarding Plaintiff's success as a distributor, the following

11  exchange occurred:

> Mr. Weaver: You have never heard a store in Vital's territory complain of the service that they received from Vital Distributions, have you?
>
> Mr. Lucas: Never had a direct complaint, but Walmart Headquarters does hold us to a pretty high standard of 98 percent in stock conditions, and Vital Distribution does perform much lower than that.
>
> Q And, so, I want to explore that. You said that Walmart wants to hold a -- a 98 percent in stock percentage?
>
> A Yeah. Walmart, the largest retailer in the country, holds us and our distributors at a very high goal of 98 percent in stock rates to make sure that they not only have stock on the shelf but also for their in-stock commissions.
>
> Q You are aware, aren't you, that one of the fundamental allegations in this lawsuit is that Pepperidge Farm is not supplying Vital sufficient product?  Are you aware of that?
>
> A Yes, I am. Yes.

Transcript Oral Argument ("Transcript"), ECF No. 97, 51:6-22.

---

[7] It follows that any potential buyback is really an illusory offer because Plaintiff's only choice is to take whatever number Defendant throws out there—so that Plaintiff can cover its ongoing expenses and compensate employees, etc.—or to wait potentially years for a payment until arbitration can commence after this litigation is resolved.  As discussed below, this Hobson's choice informs the Court's analysis of Plaintiff's breach of the implied covenant of good faith and fair dealing claims and the irreparable harms the buyback would cause.

1    Given Plaintiff's inability to meet Walmart's demanded inventory minimum,

2    especially given Plaintiff's purported success with the distributorship and in light of

3    Walmart being such a critical retailer, it appears to this Court that Plaintiff was likely not

4    provided enough product to do so.  It of course follows then that Plaintiff is likely correct

5    that Pepperidge Farm was undermining Plaintiff's potential for success by providing

6    insufficient product to meet the needs of Plaintiff's clients.

7    Finally, it appears that Plaintiff actually tried to service an "Amazon Fresh/Prime

8    Now" location within his territory at the same time he was purportedly not receiving

9    sufficient product to service his stores.  Plaintiff was advised by a "Site Lead" that:

10   
11   
12   
13   
14   
15   
> When following up with my supply chain partners, they said that we currently have several distributors that are currently supplying Pepperidge Farm products. We also have a large national contract in place that will guarantee a minimum volume with price breaks, which could make it difficult to change halfway through the year since contracts are negotiates annually.  I know your information was shared with our cookie/ snack category folks, but it didn't seem like there was a lot of interest based on our current contract guarantees. I will keep your info, and reach out if something else comes up, but I appreciate the follow up.

16   Holmes Decl., ECF No. 83-3, Ex. C.  Despite purportedly being located in Plaintiff's

17   territory, it appears that Amazon was incentivized not to collaborate with a local

18   distributor.  If Amazon is a "retail store," this arrangement would be in contravention of

19   Plaintiff's exclusive distribution rights under the Agreement.

20   In sum, Plaintiff has raised serious questions as to whether Defendant materially

21   breached the Agreement to avoid paying Plaintiff commissions and to drive down the

22   value of the distributorship.  Permitting Defendant to take advantage of those breaches

23   by now buying back the distributorship at depressed prices and forcing Plaintiff into the

24   false choice of abandoning its claims here to pursue a higher valuation in arbitration

25   would be contrary to the law.

26   
27   
28   
**b.    Plaintiff is also likely to succeed on its claim that the Defendant's exercise of the Buyback Provision independently violates the implied covenant of good faith and fair dealing.**

23

1   As indicated, Plaintiff has set forth multiple theories supporting its breach of the

2 implied covenant of good faith and fair dealing claim, and Defendant's unjustified, late-

3 night, no-notice Buyback Letter is another one.  Defendant argues in opposition that it's

4 buyback must be permitted because it is expressly allowed under the terms of the

5 Agreement.  But that argument ignores both black letter law that implies a covenant of

6 good faith in every contract and the language of Section 20 that explicitly delegates

7 Defendant the right to purchase the distributorship "in its discretion," which discretion

8 must also be exercised in good faith.  See Trishan Air, Inc. v. Fed. Ins. Co., 635 F.3d

9 422, 434 (9th Cir. 2011) (citing Brehm v. 21st Century Ins. Co., 166 Cal. App. 4th 1225,

10 1235 (2008)); Carma Dev. (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal.4th 342, 372

11 (1992).

12   In this case, Defendant's only articulated justification for the immediate buyback—

13 or the buyback at all—is that it was necessary in this instance because this was a

14 "troubled relationship" between the parties and swift action was necessary to prevent

15 Plaintiff from "disparage[ing] the company to its customers, misus[ing] product inventory

16 in their possession, interfere[ing] with deliveries of Pepperidge Farm product, or

17 otherwise disrupt[ing] Pepperidge Farm's business operations."  See, e.g., Lucas Decl.,

18 ECF No. 87-6, ¶¶ 20-21.

19   Defendant also claimed that timing the buyout for a Friday night was intended to

20 "avoid any disruption of delivery and service to [Defendant's] customers, which generally

21 is done during the week," and that the particular Friday was chosen because Mr. Lucas

22 would be in the area for "other purposes." Id., ¶ 49; ECF No. 72-1, ¶ 23.  Although not

23 mentioned in his declarations, Mr. Lucas testified at the hearing before the Court that

24 Friday was also chosen because it was the end of an accounting cycle.  These latter

25 reasons go only to Defendant's choice of days, not to its decisions to execute the

26 buyback option in the first place or to provide no notice to a third-generation, seventh-

27 year distributor.[8]

28     [8] Defendant's attempt to rely on Plaintiff's purported refusal to switchover to the new handheld

1         Remarkably, to Defendant's justification for the buyback itself, Defendant offered

2 no admissible evidence that its relationship with Plaintiff was actually troubled or had

3 devolved so much as of late that an immediate buyback was warranted.  Defendant's

4 primary witness, Mr. Lucas, testified that he had never met or spoken to Mr. Holmes and

5 he could not even identify Mr. Holmes before the Court.  Mr. Lucas had no first-hand

6 Plaintiff of any tension with Vital, and all of his testimony regarding the purportedly

7 troubled relationship with Vital was vague and based on inadmissible hearsay.

8         Defendant had ample time to plan for the buyback and had roughly a week to

9 prepare its opposition, but it was still unable to produce one witness or offer one

10 declaration from any of its employees having ever met or spoken to Mr. Holmes to

11 support its theory that the relationship between Plaintiff and Defendant had become

12 unworkable.  There was no evidence to show how that seven-year relationship, two

13 years of which spanned the time the parties' have been engaged in this litigation, had

14 changed at all in the weeks before the buyback notice issued.  There was not one

15 declaration or one specific incident identified evidencing any kind of fracture between

16 Plaintiff and Defendant.  Nor is there any evidence in the record that Mr. Holmes, despite

17 his long relationship with Defendant and his family members still managing

18 distributorships, would have taken any retaliatory actions against Defendant had he

19 been given notice of the buyback.[9]

20       —————————————

21 device system is a red herring.  Plaintiff is not the only distributor nationwide that has not switched over, but those other distributorships were apparently not targeted for buybacks.  See Lucas Decl., ECF No. 87-

22 10, Ex. D.  More importantly, however, Plaintiff has already signed up for the new program, invested in the tablets, and indicated that it will switch over once it becomes necessary.  Hagey Decl., ECF No. 87-1, Ex.

23 D.  Mr. Lucas testified that he knew Plaintiff had signed up for the "Bronze Plan" and that the official transition to the new handheld devices had not yet occurred in any event.  Transcript, ECF No. 97, 59:14-

24 60:1.  He also admitted that the ultimate transition should be a fairly seamless process that would not cause disruption to distributorships.  Id., 60:2-21.  It is undisputed that Plaintiff has actually purchased its

25 own compliant tablets and is ready to switch over when necessary.  The handheld devices are simply not an issue and appear to be being used as a post hoc justification for the timing of the buyback.

26       [9] Mr. Lucas testified in Court that his knowledge of the situation had changed during the period leading up to the buyback, but since there was no evidence before the Court as to the basis for that

27 knowledge, his testimony is irrelevant.  The Court also finds Mr. Lucas' testimony  unpersuasive for other reasons because several aspects of his testimony undermined his credibility.  For example, Mr. Lucas

28 testified that: (1) he had no idea a new Costco, projected to be the busiest in the Sacramento area, was opening in his region during the same week he was in town and despite the fact that after the buyback in

1      Having failed to make that showing, Defendant is left with no justification for either

2    the buyback itself or for its timing.  And while a company could conceivably buyback a

3    distributorship for <u>any</u> reason, it makes no good business sense, and certainly does not

4    evidence good faith, to do so with <u>no</u> reason.  The Court is left with no alternative but to

5    infer from the facts before it and from Defendant's failed justifications that Defendant

6    pulled this stunt on a Friday night in bad faith.

7      Let the Court elaborate:  (1) Plaintiff, a third generation distributor who

8    successfully operated his territory for seven years, sues Defendant alleging that

9    Defendant is purposefully directing product away from Plaintiff and to e-commerce

10   retailers and failing to compensate Plaintiff for sales to those e-commerce retail stores to

11   drive down the value of his distributorship; (2) Defendant refuses to turn over critical

12   discovery as to Amazon and e-commerce transactions, which goes to the very crux of

13   Plaintiff's claims, even after ordered by a federal court to do so; (3) despite refusing to

14   cooperate with discovery, Defendant demands that Plaintiff produce irrelevant evidence

15   about how it is paying to litigate this case and to offer dates Defendant may depose

16   Plaintiff's witnesses; (4) Defendant then seeks to capitalize on the aforementioned

17   breaches by exercising a buyout of Plaintiff's distributorship at an artificially deflated

18   valuation and invokes the arbitration provision should Plaintiff disagree with that price;

19   (5) Defendant also times this  buyback such that Plaintiff will not receive any

20   commissions from the new Natomas Costco that had opened the day before;

21   _____

22   this case, Defendant planned to keep warehouse stores for itself, Transcript, ECF No. 97 39:18-25;
(2) although Mr. Lucas testified that Plaintiff's obstinance was taking up a considerable amount of his time,

23   he was unfamiliar with how Plaintiff performed relative to other distributors in his region and  lacked any
specific knowledge regarding Plaintiff's performance; (3) while Plaintiff stated in his declaration that

24   "[a]lmost all of Pepperidge Farm's 3,000-plus IDPs have already upgraded or will shortly upgrade their
handheld computers to be compatible with the new software," ECF No. 87-6 at ¶ 41 (emphasis added),
and that "nearly 97% of PF routes [were] actively" using the new technology, <u>id.</u>, Ex D, he testified before

25   the Court that he was not aware whether any other distributors in the country had yet to switch over,
Transcript, 59:2-9; (4) he was also unaware that Plaintiff had already purchased the new handheld

26   devices, <u>id.</u> at 59:10-18.  It is simply incredible to this Court that a person in Mr. Lucas' position would be
so out of touch with his region, and with this particular Plaintiff, on these critical points, especially given the

27   posture of this litigation and the more recent buyback attempt.  Either Mr. Lucas did not have a finger on
the pulse of his territory or he was being evasive with the Court.  Either way, this entitles his testimony to

28   less weight.

1    (6) Defendant gives Plaintiff 30-minutes notice before hostilely taking over Plaintiff's

2    operations, but cannot articulate any good faith basis for doing so other than "the

3    contract says we can" and the parties' relationship is "troubled"; (7) Defendant

4    immediately breaks the distributorship into four territories, removes warehouse stores

5    from those contracts, and lists them for sale at a discount; and (8) once this Court issues

6    a TRO, Defendant finally starts to cooperate with Plaintiff on discovery issues, agreeing

7    to produce documents and scheduling dates for depositions.[10]  As this Court noted at the

8    hearing, bad faith is an amorphous concept, and the Court knows it when it sees it.

9    ///

10   ///

11   ///

12   ///

_____

13   [10] Defendant's argument to the Court that it started cooperating with discovery efforts in the days

14   prior to the TRO issuing is contrary to the facts presented and undermines counsels' credibility as well.
     Two days prior to the buyback Defendant's counsel emailed Plaintiff's counsel demanding discovery and

15   deposition dates, while refusing to provide dates for its own witnesses.  In addition, counsel stated,

16            Regarding Pepperidge's hit counts and related information, see below,
              which includes families for all the custodians we discussed, including Brad

17            Hope and David Burke. **As you can see, the term-level hits are quite
              high, and reviewing the results would be disproportionate to the

18            needs of the case. We continue to maintain that the searches
              Pepperidge Farm originally ran, reviewed, and produced for RFPs 40-

19            43 were reasonable and proportional.**  We are happy to discuss with
              you further."

20   Hagey Decl., ECF No. 87-2, Ex. A (emphasis added).

21            This is the only email counsel was able to point to in support of its cooperation argument and it is
     notable both for what it says and what it does not say.  First, it explicitly says that Defendant is not

22   reviewing document results because the hit count is too high, and Defendant has already decided that
     doing so would be disproportionately burdensome.  That is not cooperation, especially since this

23   production is already the subject of a court order.  Second, the email declines to offer any deposition dates
     for Defendant, despite Plaintiff asking for dates for months.  See Weaver Decl., ECF No. 70-2, ¶ 8.

24   Finally, Defendant's counsel demands that Plaintiff produce evidence and deposition dates itself even as
     Defendant gives nothing in return.  Throw away phrases like "[w]e are happy to discuss with you further"

25   do not change the substance of this communication, which is clearly non-cooperative.  The only
     correspondence Defendant provides from its counsel that actually evidences an effort to move discovery

26   forward is dated March 21, 2024, the day after the Court granted Plaintiff's TRO.  Id.

27            Unfortunately, this dilatory approach to discovery adds to the specter of bad faith in this case and
     counsel has a hand in it now.  While counsel has a duty to diligently defend their client, they are also

28   obligated to fulfill their obligations as officers of the Court and that means they cannot decline to produce
     discovery as ordered, regardless of how disproportionate counsel thinks the effort might be.

1    Given Defendant's lack of evidence to support its only articulated justifications for

2   exercising the buyback option and doing so in the manner it did, the Court is left to infer

3   from Defendant's remaining conduct that Defendant concocted this buyback plan

4   strategically to avoid turning over discovery, to bankrupt Plaintiff into accepting

5   Defendant's unilaterally calculated valuation offer—which is derived directly from the

6   very values Plaintiff argues are deflated by way of this action—to sell off the

7   distributorship to bona fide purchasers before the buyback could be challenged in a

8   court of law, and to attempt to shift this litigation into an arbitral forum by way of Section

9   20.

10    As to this last point, Defendant's arguments that it was somehow generously

11   compensating Plaintiff for the buyback of the distributorship and that it was "assuring"

12   Plaintiff in the Buyback Letter that it "would not be used to undermine the parties'

13   pending dispute" is disingenuous and ignores the practical realities of this unique

14   situation.  First, contrary to Defendant's beliefs, and based on the Court's findings above,

15   the proposed $1.2 million payout to Plaintiff is not a windfall.  Defendant came up with

16   that number based on Plaintiff's past sales, which Plaintiff contends are already

17   undervalued because Defendant refused to provide sufficient product to Plaintiff or to

18   pay for the disputed e-commerce sales.  Defendant knew that by immediately buying

19   back the distributorship and cutting off Plaintiff's income stream, it was leaving Plaintiff

20   with a false choice between taking the $1.2 million—which would allow it to pay its bills

21   and provide some sort of severance or stability to its employees—and taking the

22   valuation dispute to arbitration to fight over the appropriate buyback amount.

23    And again, that valuation dispute would of course raise the same issues already

24   at issue in this litigation and would undermine the Court's resolution of this first-filed

25   case.  To challenge Defendant's valuation, Plaintiff would have to make the same

26   arguments before the arbitrator that it raises here.  Arbitration could wait, but of course

27   Plaintiff would not be paid.  This case could wait, but then of course Plaintiff would be

28   bound by the decisions of the arbitrators, effectively depriving it of its day in court.

1    Despite Defendant's placations, these two proceedings cannot proceed in parallel in a

2    way that is beneficial to anyone but Defendant.  Defendant's attempt to shift this case to

3    a different forum as an end-run around this Court's adjudication of this case, especially

4    after receiving adverse decisions from both this Court and the magistrate judge and after

5    refusing to turn over discovery relevant to the most core questions in this case, further

6    evidences Defendant's bad faith.

7          If none of the foregoing was Defendant's intent, surely it could have provided

8    some evidence indicating it had exercised its discretion in good faith.  Defendant had

9    ample time to oppose this Motion and its lack of evidence speaks volumes.  Accordingly,

10   the Court concludes that Plaintiff is likely to succeed on its breach of the implied

11   covenant of good faith and fair dealing claim.  At the very least, Plaintiff has raised

12   serious questions going to its merits.

13                    **3.    Irreparable Harm**

14         The parties dispute here centers on the general rule that if monetary damages will

15   make a party whole, injunctive relief is inappropriate.  See E. Bay Sanctuary Covenant v.

16   Biden, 993 F.3d 640, 677 (9th Cir. 2021) ("Irreparable harm is harm for which there is no

17   adequate legal remedy, such as an award.").  Indeed, Defendant contends, in a nutshell,

18   that Plaintiff will suffer only monetary harms if the buyback is permitted to be executed

19   and it "will be fully compensated for its business in accordance with the parties' agreed-

20   upon Buyback."  Def.'s Opp., ECF No. 87, at 16.[11]

21         The harms to Plaintiff in this case, however, go beyond monetary relief.  More

22   specifically, Plaintiff contends that, absent an injunction, it faces the absolute threat of

23   extinction, and will suffer a loss of prospective customers, business goodwill, and

24   potentially employees.

25   ///

26   ///

27   _____

28         [11] This argument is circular because it assumes Defendant's valuation is correct and that it
     appropriately compensates Plaintiff.  That remains to be seen.

1    Defendant's own arguments illustrate Plaintiff's point.  While Defendant argues

2  out of one side of its mouth that there is no possibility of irreparable harm to Plaintiff, it

3  then argues out of the other side that "any unwinding of the buyout would cause

4  disruption and upend the fully transitioned distributorship."  Decl. of John Lucas, ECF

5  No. 72-1, § F.  In fact, Mr. Lucas testified:

6    
7    > [F]orcing Pepperidge Farm to unwind the planning and implementation of our new distribution in the territory would cause needless harm to our goodwill with customers – who have just gotten introduced and are doing business with Pepperidge Farm's new representatives.
8    

9    > We cannot imagine anything more confusing or strange for a retailer to be jerked around in this manner: told of a transition to a new distributor, then forced to re-engage with a former distributor who is actively litigating with the brand.
10    
11    
12    > Such events not only would be expensive and cumbersome, but create considerable friction and uncertainty in the field.

13  Id., ¶¶ 33-35.

14    These are the exact harms that will befall Plaintiff.  Defendant operated the

15  distributorship for at most five days.  Plaintiff operated it for seven years.  It makes no

16  sense to argue that these same harms would not exponentially be suffered by Plaintiff,

17  who has also argued that it will suffer a loss of goodwill and friction with retailers

18  resulting from substantial uncertainty.

19    Perhaps even more importantly, however, Plaintiff employs real people and

20  Defendant's conduct will, with no notice, put Plaintiff out of business and push those

21  employees out of jobs.  It is clear that Defendant was operating with the singular goal of

22  obliterating Plaintiff and its operations, which would also result in the termination of this

23  litigation.  Absent the TRO and a PI, it would have been successful.

24    The one-off nature of this case cannot be overstated because the Court is not

25  being asked to enjoin Defendant's invocation of Section 20 against a clean slate.

26  ///

27  ///

28  ///

1   Rather, the Court is being asked to enjoin Defendant's invocation of Section 20 at a time

2   when the fair market value cannot be determined by the parties or by an arbitral forum

3   because the issues necessary to resolve that question are pending before this Court by

4   way of Plaintiffs' existing claims.  Defendant had to know that Plaintiff could not accept

5   Defendant's valuation without jeopardizing this litigation and that any valuation fight in

6   arbitration would be dependent on the outcome of this case.  From a practical

7   perspective, there can be no immediate payout without sacrificing the claims here.  If the

8   Court permitted the buyback to go through, Plaintiff could:  (1) accept Defendant's

9   valuation of the distributorship, which would be an admission that the claims in this case

10  lacked merit; or (2) reject Defendant's valuation, which would mean the parties would

11  have to arbitrate that issue.  In order to maintain the integrity of the current case, the

12  arbitration would have to wait for a judgment here.  The practical effect is that Defendant

13  puts Plaintiff out of business, but Plaintiff does not see a payout for years.  The only way

14  Plaintiff can avoid that outcome is to abandon this litigation, either by accepting

15  Defendant's valuation or by arbitrating these issues instead.  Accordingly, when

16  Defendant sent the Buyback Letter, it took Plaintiff hostage and the ransom is this

17  litigation.  That is irreparable harm, and this is why equity exists.[12]

18              **4.    Balance of Equities**

19          On balance, Defendant has identified no real harm it will suffer by having Plaintiff

20  continue to maintain the distributorship.  Someone has to distribute product on

21  Defendant's behalf, so there appears to be no real burden in having Plaintiff do so.

22  ///

23  ///

24  ///

25  _____

26  [12] It is curious to the Court that Defendant, a major conglomerate, appears to have recently
    focused its litigation strategy on destroying Plaintiff, one small long-time distributor in one region in one
27  state, before it has to address the e-commerce issue in this case.  Time will tell if this is just the result of
    over-lawyering or if Defendant was appropriately concerned about the ripple effect this case could have on
28  its roughly 3,000 distributorships nationwide.  It certainly seems as if Defendant is bringing a battleship to
    a knife fight.

Defendant failed to show that the relationship between the parties is actually troubled, so the only other articulable harm that Defendant could suffer is having to continue to work with a distributor with whom it is in active litigation.  But the parties have been doing that for almost two years already, with apparently no issue.  And any harm Defendant might suffer in reconveying the distributorship is self-inflicted.  On the other hand, as just indicated, the harms to Plaintiff absent injunctive relief will be great and the equities favor preserving the status quo through the course of this litigation.

### 5.    Public Interest

In this dispute between private parties over a private contract, the public interest is minimally implicated.  As far as policy concerns, however, the Court concludes that the public interest favors precluding a contracting party from capitalizing on its prior breaches to engage in further bad faith conduct to the detriment of the already injured party.  This factor is at worst neutral and at best favors fairness and equity.

### 6.    Bond

Defendant requests a $200,000 bond which "includes reinstating Plaintiff, including its on-location access, moving large amounts of product into and within the warehouses for Plaintiff, and maintaining a legacy server at a cost of approximately $150,000 per month to support Plaintiff's old handheld devices."  Def.'s Opp., 87, at 20. That $150,000 per month appears to cover all distributors who have not converted to the new system, not just Plaintiff.  In any event, Plaintiff has never said it will not comply, just that it did not plan to do so until required.  As discussed above, Plaintiff has already signed up for the new program and purchased the requisite handheld devices, so this argument is moot.  Moreover, Defendant has not offered evidence to establish that it will suffer losses if it moves forward with Plaintiff continuing to operate the distributorship as it has for the last seven years.  There being no other persuasive justification for a bond request, the Court determines that none is required.  Defendant's request for a bond is DENIED.

///

### B.    Administrative Matters

#### 1.    Discovery

As the Court directed during the course of oral argument, Defendant shall provide documents responsive to Plaintiff's outstanding discovery requests, and as ordered by Magistrate Judge Newman on August 30, 2023, to Plaintiff not later than 5:00 p.m. on Thursday, April 11, 2024.  Plaintiff shall file a status report with regard to that production not later than 5:00 p.m. on April 12, 2024.  If Defendant fails to timely comply with this Order, it will result in the imposition of sanctions upon no further notice to the parties.

In addition, any and all of Defendant's requests for evidence and/or information pertaining to Plaintiff's financing of this litigation are STRICKEN.[13]

#### 2.    Request for Stay

At oral argument, Defendant requested that this Court "stay the effect of . . . [its] order so that [Defendant] would have the ability if [it] need to to seek appellate review." Transcript, ECF No. 97, 76:7-9.  That request is DENIED.  A stay in this case would make no practical sense because it would require once again transferring the distributorship, which has already been documented to cause disruptions and confusion among the retailers and would ultimately defeat the entire purpose of the Court's injunctive relief order.  The Court has set trial in this matter to commence on September 3, 2024, at 9:00 a.m.  Setting this expedited trial date will serve to minimize any potential harms Defendant believes it will suffer while the injunction remains in place during the pendency of this action.

///

---

[13] Defendant's counsel avers that, "In my experience, such communications about a pending lawsuit are not privileged and often can be highly relevant – as they contain admissions against interest and fully explain a party's true intent in filing (and needlessly continuing) a lawsuit."  Decl. of J. Noah Hagey, ECF No. 87-1, ¶ 21.  Counsel is also "concerned that Plaintiff may be misusing the discovery process as a wasteful fishing expedition against my client."  Id., ¶ 26.  Engaging in discovery to pursue claims that this Court has already determined are sufficient to withstand a Rule 12(b)(6) motion, discovery that another federal judge has already compelled, is hardly a fishing expedition or needless continuation of a case.  Nor does the Court see how Plaintiff's "true intent" in bringing a non-frivolous suit is relevant.  In any event, if Plaintiff made any relevant, non-privileged "statement[s] against interest" with respect to the substance of this action, the Court has no doubt their production will be captured by other well-written discovery requests.

### 3. Amendment of the Complaint

In its Motion for TRO and in connection with briefing on its Motion for Preliminary Injunction, Plaintiff requests leave to amend its FAC, should the Court deem it necessary to add the additional facts that have arisen lately with regard to the buyback and any new causes of action that might be implicated as well.  See ECF No. 70-1, at 13 n.5 ("To the extent the Court deems it necessary, Vital seeks leave to amend its FAC to add allegations regarding this further breach of the covenant of good faith and fair dealing."); ECF No. 83-1, at 16 n.6 (same); ECF No. 91, at 4 n.2 ("Pepperidge Farm's conduct, the final step in its years' long campaign to drive down the value of Vital's Territory, also gives rise to a claim for violation of Business and Professions Code section 17200, which independently allows for injunctive relief.  Vital renews its request for leave to amend to the extent the Court deems it necessary for granting the requested injunction.").  The Court agrees that amendment is warranted and good cause has been shown.  Plaintiff's requests are thus GRANTED.  As set forth below, Plaintiff shall have twenty (20) days in which to file a Second Amended Complaint.

**CONCLUSION**

**For the reasons set forth above, it is HEREBY ORDERED that:**

1. Plaintiff's Motion for Preliminary Injunction (ECF No. 83) is GRANTED;

2. Defendant is enjoined and restrained from terminating or otherwise buying back Plaintiff's distributorship pursuant to Paragraph 20 of the parties' Consignment Agreement pending resolution of Plaintiff's claims on the merits;

3. Defendant shall restore and maintain Plaintiff's operations to the status quo that existed prior to 4:30 p.m. PDT on March 15, 2024;

4. Defendant is enjoined and restrained from restricting Plaintiff's ability to conduct its business in the manner that Plaintiff did prior to 4:30 p.m. PDT on March 15, 2024;

5.      Defendant is enjoined and restrained from removing, restricting, preventing or otherwise interfering with Plaintiff's ability to order, sell, and deliver Defendant's products within Plaintiff's exclusive Territory, as Plaintiff did prior to 4:30 p.m. PDT on March 15, 2024;

6.      Defendant is enjoined and restrained from selling, transferring, trading, or modifying, or marketing any sale, transfer, trade, or modification of, any portion of Plaintiff's operations within its exclusive Territory;

7.      Defendant shall maintain Plaintiff's access and ability to use handheld devices and computers and related systems relating to Plaintiff's orders, inventory, and sales.

8.      Defendant is enjoined and restrained from directing any third parties not to work with or accept deliveries from Plaintiff.

9.      Absent further order of this Court, Plaintiff and Defendant are enjoined from speaking to third parties, such as retail stores or vendors, about this litigation.

**In addition, it is FURTHER ORDERED that:**

1.      Defendant's Motion for a Stay of this decision pending appeal is DENIED;

2.      As directed by the Court at the hearing on March 28, 2024, Defendant shall provide documents responsive to Plaintiff's outstanding discovery requests, and as ordered by Magistrate Judge Newman on August 30, 2023, to Plaintiff not later than 5:00 p.m. on Thursday, April 11, 2024;

3.      Defendant's failure to timely comply with the foregoing Order will result in the imposition of sanctions upon no further notice to the parties;

4.      Plaintiff shall file a status report regarding that production of documents not later than 5:00 p.m. on April 12, 2024;

5.      Any and all of Defendant's requests for evidence and/or information pertaining to Plaintiff's financing of this litigation are STRICKEN;

///

///

6.      Not later than twenty (20) days following the date this Memorandum and Order is electronically filed, Plaintiff shall file its Second Amended Complaint including any allegations and additional causes of action relevant to its challenges to Defendant's exercise of the buyback provision; and

7.      The Final Pretrial Conference set on July 25, 2024, at 10:00 a.m. PDT by Zoom videoconference and the Jury Trial set on September 3, 2024, at 9:00 a.m. PDT in courtroom 7 are hereby CONFIRMED.

IT IS SO ORDERED.

Dated:  April 6, 2024

_____
MORRISON C. ENGLAND, JR.
SENIOR UNITED STATES DISTRICT JUDGE